# UNITED STATES *v.* BUTLER ET AL., RECEIVERS OF HOOSAC MILLS CORP.

No. 401.   Argued December 9, 10, 1935.—Decided January 6, 1936.

1

*Solicitor General Reed,* orally, after stating the case:

8

Extracts from the printed argument for the Government, signed by *Attorney General Cummings, Solicitor General Reed, Assistant Attorney General Wideman, Assistant Attorney General Morris,* and *Messrs. Sewall Key, Andrew D. Sharpe, Robert N. Anderson, Alger Hiss, Mastin G. White,* and *Prew Savoy.*

18

22

Oral argument of *Mr. George Wharton Pepper,* for respondents.

24

28

36

38

*Messrs. Edward R. Hale* and *Bennett Sanderson* closed the argument for respondents.

*James A. Montgomery, Jr., J. Willison Smith, Jr.,* and
*Edmund M. Toland:*

*Solicitor General Reed* closed the argument:

MR. JUSTICE ROBERTS delivered the opinion of the Court.

In this case we must determine whether certain provisions of the Agricultural Adjustment Act, 1933,[1] conflict with the Federal Constitution.

Title I of the statute is captioned "Agricultural Adjustment." Section 1 recites that an economic emergency has arisen, due to disparity between the prices of agricultural and other commodities, with consequent destruction of farmers' purchasing power and breakdown in orderly exchange, which, in turn, have affected transactions in agricultural commodities with a national public interest and burdened and obstructed the normal currents of commerce, calling for the enactment of legislation.

---

[1] May 12, 1933, c. 25, 48 Stat. 31.

Section 2 declares it to be the policy of Congress:

"To establish and maintain such balance between the production and consumption of agricultural commodities, and such marketing conditions therefor, as will reëstablish prices to farmers at a level that will give agricultural commodities [2] a purchasing power with respect to articles that farmers buy, equivalent to the purchasing power of agricultural commodities in the base period."

The base period, in the case of cotton, and all other commodities except tobacco, is designated as that between August, 1909, and July, 1914.

The further policies announced are an approach to the desired equality by gradual correction of present inequalities "at as rapid a rate as is deemed feasible in view of the current consumptive demand in domestic and foreign markets," and the protection of consumers' interest by readjusting farm production at such level as will not increase the percentage of the consumers' retail expenditures for agricultural commodities or products derived therefrom, which is returned to the farmer, above the percentage returned to him in the base period.

Section 8 provides, amongst other things, that "In order to effectuate the declared policy," the Secretary of Agriculture shall have power

"(1) To provide for reduction in the acreage or reduction in the production for market, or both, of any basic agricultural commodity, through agreements with producers or by other voluntary methods, and to provide for rental or benefit payments in connection therewith or upon that part of the production of any basic agricultural commodity required for domestic consumption, in such amounts as the Secretary deems fair and reasonable, to

[2] Section 11 denominates wheat, cotton, field corn, hogs, rice, tobacco, and milk and its products, "basic agricultural commodities," to which the act is to apply. Others have been added by later legislation.

be paid out of any moneys available for such payments. . . . "

"(2) To enter into marketing agreements with processors, associations of producers, and others engaged in the handling, in the current of interstate or foreign commerce of any agricultural commodity or product thereof, after due notice and opportunity for hearing to interested parties. . . ."

"(3) To issue licenses permitting processors, associations of producers, and others to engage in the handling, in the current of interstate or foreign commerce, of any agricultural commodity or product thereof, or any competing commodity or product thereof."

It will be observed that the Secretary is not required, but is permitted, if, in his uncontrolled judgment, the policy of the act will so be promoted, to make agreements with individual farmers for a reduction of acreage or production upon such terms as he may think fair and reasonable.

Section 9 (a) enacts:

"To obtain revenue for extraordinary expenses incurred by reason of the national economic emergency, there shall be levied processing taxes as hereinafter provided. When the Secretary of Agriculture determines that rental or benefit payments are to be made with respect to any basic agricultural commodity, he shall proclaim such determination, and a processing tax shall be in effect with respect to such commodity from the beginning of the marketing year therefor next following the date of such proclamation. The processing tax shall be levied, assessed, and collected upon the first domestic processing of the commodity, whether of domestic production or imported, and shall be paid by the processor. . .

The Secretary may from time to time, if he finds it necessary for the effectuation of the policy of the act, readjust the amount of the exaction to meet the require-

ments of subsection (b). The tax is to terminate at the end of any marketing year if the rental or benefit payments are discontinued by the Secretary with the expiration of that year.

Section 9 (b) fixes the tax "at such rate as equals the difference between the current average farm price for the commodity and the fair exchange value," with power in the Secretary, after investigation, notice, and hearing, to readjust the tax so as to prevent the accumulation of surplus stocks and depression of farm prices.

Section 9 (c) directs that the fair exchange value of a commodity shall be such a price as will give that commodity the same purchasing power with respect to articles farmers buy as it had during the base period and that the fair exchange value and the current average farm price of a commodity shall be ascertained by the Secretary from available statistics in his department.

Section 12 (a) appropriates $100,000,000 "to be available to the Secretary of Agriculture for administrative expenses under this title and for rental and benefit payments . . ."; and § 12 (b) appropriates the proceeds derived from all taxes imposed under the act " to be available to the Secretary of Agriculture for expansion of markets and removal of surplus agricultural products . . . administrative expenses, rental and benefit payments, and refunds on taxes."

Section 15 (d) permits the Secretary, upon certain conditions, to impose compensating taxes on commodities in competition with those subject to the processing tax.

By § 16 a floor tax is imposed upon the sale or other disposition of any article processed wholly or in chief value from any commodity with respect to which a processing tax is to be levied in amount equivalent to that of the processing tax which would be payable with respect to the commodity from which the article is processed if the processing had occurred on the date when the processing tax becomes effective.

On July 14, 1933, the Secretary of Agriculture, with the approval of the President, proclaimed that he had determined rental and benefit payments should be made with respect to cotton; that the marketing year for that commodity was to begin August 1, 1933; and calculated and fixed the rates of processing and floor taxes on cotton in accordance with the terms of the act.

The United States presented a claim to the respondents as receivers of the Hoosac Mills Corporation for processing and floor taxes on cotton levied under §§ 9 and 16 of the act. The receivers recommended that the claim be disallowed. The District Court found the taxes valid and ordered them paid.[3] Upon appeal the Circuit Court of Appeals reversed the order.[4] The judgment under review was entered prior to the adoption of the amending act of August 24, 1935,[5] and we are therefore concerned only with the original act.

*First.* At the outset the United States contends that the respondents have no standing to question the validity of the tax. The position is that the act is merely a revenue measure levying an excise upon the activity of processing cotton,—a proper subject for the imposition of such a tax,—the proceeds of which go into the federal treasury and thus become available for appropriation for any purpose. It is said that what the respondents are endeavoring to do is to challenge the intended use of the money pursuant to Congressional appropriation when, by confession, that money will have become the property of the Government and the taxpayer will no longer have any interest in it. *Massachusetts* v. *Mellon*, 262 U. S. 447, is claimed to foreclose litigation by the respondents or other taxpayers, as such, looking to restraint of the expenditure of government funds. That case might be an authority

---

[3] *Franklin Process Co.* v. *Hoosac Mills Corp.*, 8 F. Supp. 552.

[4] *Butler* v. *United States,* 78 F. (2d) 1.

[5] 49 Stat. 750, c. 641.

in the petitioners' favor if we were here concerned merely with a suit by a taxpayer to restrain the expenditure of the public moneys. It was there held that a taxpayer of the United States may not question expenditures from its treasury on the ground that the alleged unlawful diversion will deplete the public funds and thus increase the burden of future taxation. Obviously the asserted interest of a taxpayer in the federal government's funds and the supposed increase of the future burden of taxation is minute and indeterminable. But here the respondents who are called upon to pay moneys as taxes, resist the exaction as a step in an unauthorized plan. This circumstance clearly distinguishes the case. The Government in substance and effect asks us to separate the Agricultural Adjustment Act into two statutes, the one levying an excise on processors of certain commodities, the other appropriating the public moneys independently of the first. Passing the novel suggestion that two statutes enacted as parts of a single scheme should be tested as if they were distinct and unrelated, we think the legislation now before us is not susceptible of such separation and treatment.

The tax can only be sustained by ignoring the avowed purpose and operation of the act, and holding it a measure merely laying an excise upon processors to raise revenue for the support of government. Beyond cavil the sole object of the legislation is to restore the purchasing power of agricultural products to a parity with that prevailing in an earlier day; to take money from the processor and bestow it upon farmers [6] who will reduce their acreage for

---

[6] U. S. Department of Agriculture, Achieving A Balanced Agriculture, p. 38: "Farmers should not forget that all the processing tax money ends up in their own pockets. Even in those cases where they pay part of the tax, they get it all back. Every dollar collected in processing taxes goes to the farmer in benefit payments."
. U. S. Dept. of Agriculture, The Processing Tax, p. 1: "Proceeds of processing taxes are passed to farmers as benefit payments."

the accomplishment of the proposed end, and, meanwhile to aid these farmers during the period required to bring the prices of their crops to the desired level.

The tax plays an indispensable part in the plan of regulation. As stated by the Agricultural Adjustment Administrator, it is " the heart of the law "; a means of " accomplishing one or both of two things intended to help farmers attain parity prices and purchasing power." [7] A tax automatically goes into effect for a commodity when the Secretary of Agriculture determines that rental or benefit payments are to be made for reduction of production of that commodity. The tax is to cease when rental or benefit payments cease. The rate is fixed with the purpose of bringing about crop-reduction and price-raising. It is to equal the difference between the " current average farm price " and " fair exchange value." It may be altered to such amount as will prevent accumulation of surplus stocks. If the Secretary finds the policy of the act will not be promoted by the levy of the tax for a given commodity, he may exempt it. (§ 11.) The whole revenue from the levy is appropriated in aid of crop control; none of it is made available for general governmental use. The entire agricultural adjustment program embodied in Title I of the act is to become inoperative when, in the judgment of the President, the national economic emergency ends; and as to any commodity he may terminate the provisions of the law, if he finds them no longer requisite to carrying out the declared policy with respect to such commodity. (§ 13.)

The statute not only avows an aim foreign to the procurement of revenue for the support of government, but by its operation shows the exaction laid upon processors to be the necessary means for the intended control of agricultural production.

[7] U. S. Department of Agriculture, Agricultural Adjustment, p. 9.

In these aspects the tax, so-called, closely resembles that laid by the Act of August 3, 1882, entitled "An Act to Regulate Immigration," which came before this court in the *Head Money Cases*, 112 U. S. 580. The statute directed that there should be levied, collected and paid a duty of fifty cents for each alien passenger who should come by vessel from a foreign port to one in the United States. Payment was to be made to the collector of the port by the master, owner, consignee or agent of the ship; the money was to be paid into the Treasury, was to be called the immigrant fund, and to be used by the Secretary of the Treasury to defray the expense of regulating immigration, for the care of immigrants and relieving those in distress, and for the expenses of effectuating the act.

Various objections to the act were presented. In answering them the court said (p. 595):

"But the true answer to all these objections is that the power exercised in this instance is not the taxing power. The burden imposed on the ship owner by this statute is the mere incident of the regulation of commerce—of that branch of foreign commerce which is involved in immigration. . . ."

"It is true not much is said about protecting the ship owner. But he is the man who reaps the profit from the transaction, . . . The sum demanded of him is not, therefore, strictly speaking, a tax or duty within the meaning of the Constitution. The money thus raised, though paid into the Treasury, is appropriated in advance to the uses of the statute, and does not go to the general support of the government."

While there the exaction was sustained as an appropriate element in a plan within the power of Congress "to regulate commerce with foreign nations," no question was made of the standing of the shipowner to raise the ques-

tion of the validity of the scheme and consequently of the exaction which was an incident of it.

It is inaccurate and misleading to speak of the exaction from processors prescribed by the challenged act as a tax, or to say that as a tax it is subject to no infirmity. A tax, in the general understanding of the term, and as used in the Constitution, signifies an exaction for the support of the Government. The word has never been thought to connote the expropriation of money from one group for the benefit of another. We may concede that the latter sort of imposition is constitutional when imposed to effectuate regulation of a matter in which both groups are interested and in respect of which there is a power of legislative regulation. But manifestly no justification for it can be found unless as an integral part of such regulation. The exaction cannot be wrested out of its setting, denominated an excise for raising revenue and legalized by ignoring its purpose as a mere instrumentality for bringing about a desired end. To do this would be to shut our eyes to what all others than we can see and understand. *Child Labor Tax Case,* 259 U. S. 20, 37.

We conclude that the act is one regulating agricultural production; that the tax is a mere incident of such regulation and that the respondents have standing to challenge the legality of the exaction.

It does not follow that as the act is not an exertion of the taxing power and the exaction not a true tax, the statute is void or the exaction uncollectible. For, to paraphrase what was said in the *Head Money Cases* (*supra*), p. 596, if this is an expedient regulation by Congress, of a subject within one of its granted powers, "and the end to be attained is one falling within that power, the act is not void, because, within a loose and more extended sense than was used in the Constitution," the exaction is called a tax.

*Second.* The Government asserts that even if the respondents may question the propriety of the appropriation embodied in the statute their attack must fail because Article I, § 8 of the Constitution authorizes the contemplated expenditure of the funds raised by the tax. This contention presents the great and the controlling question in the case.[8] We approach its decision with a sense of our grave responsibility to render judgment in accordance with the principles established for the governance of all three branches of the Government.

There should be no misunderstanding as to the function of this court in such a case. It is sometimes said that the court assumes a power to overrule or control the action of the people's representatives. This is a misconception. The Constitution is the supreme law of the land ordained and established by the people. All legislation must conform to the principles it lays down. When an act of Congress is appropriately challenged in the courts as not conforming to the constitutional mandate the judicial branch of the Government has only one duty,—to lay the article of the Constitution which is invoked beside the statute which is challenged and to decide whether the latter squares with the former. All the court does, or can do, is to announce its considered judgment upon the ques-

---

[8] Other questions were presented and argued by counsel, but we do not consider or decide them. The respondents insist that the act in numerous respects delegates legislative power to the executive contrary to the principles announced in *Panama Refining Co.* v. *Ryan,* 293 U. S. 388, and *Schechter Corp.* v. *United States,* 295 U. S. 495; that this unlawful delegation is not cured by the amending act of August 24, 1935; that the exaction is in violation of the due process clause of the Fifth Amendment since the legislation takes their property for a private use; that the floor tax is a direct tax and therefore void for lack of apportionment amongst the states, as required by Article I, § 9; and that the processing tax is wanting in uniformity and so violates Article I, § 8, clause one, of the Constitution.

tion. The only power it has, if such it may be called, is the power of judgment. This court neither approves nor condemns any legislative policy. Its delicate and difficult office is to ascertain and declare whether the legislation is in accordance with, or in contravention of, the provisions of the Constitution; and, having done that, its duty ends.[9]

The question is not what power the Federal Government ought to have but what powers in fact have been given by the people. It hardly seems necessary to reiterate that ours is a dual form of government; that in every state there are two governments,—the state and the United States. Each State has all governmental powers save such as the people, by their Constitution, have conferred upon the United States, denied to the States, or reserved to themselves. The federal union is a government of delegated powers. It has only such as are expressly conferred upon it and such as are reasonably to be implied from those granted. In this respect we differ radically from nations where all legislative power, without restriction or limitation, is vested in a parliament or other legislative body subject to no restrictions except the discretion of its members.

Article I, § 8, of the Constitution vests sundry powers in the Congress. But two of its clauses have any bearing upon the validity of the statute under review.

The third clause endows the Congress with power "to regulate Commerce . . . among the several States." Despite a reference in its first section to a burden upon, and an obstruction of the normal currents of commerce, the act under review does not purport to regulate transactions in interstate or foreign [10] commerce. Its stated pur-

---

[9] Compare *Adkins* v. *Children's Hospital,* 261 U. S. 52 , 544; *Massachusetts* v. *Mellon,* 262 U. S. 447, 488.

[10] The enactment of protective tariff laws has its basis in the power to regulate foreign commerce. See *Board of Trustees of the University of Illinois* v. *United States,* 289 U. S. 48, 58.

pose is the control of agricultural production, a purely local activity, in an effort to raise the prices paid the farmer. Indeed, the Government does not attempt to uphold the validity of the act on the basis of the commerce clause, which, for the purpose of the present case, may be put aside as irrelevant.

The clause thought to authorize the legislation,—the first,—confers upon the Congress power "to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States. . . ." It is not contended that this provision grants power to regulate agricultural production upon the theory that such legislation would promote the general welfare. The Government concedes that the phrase "to provide for the general welfare" qualifies the power "to lay and collect taxes." The view that the clause grants power to provide for the general welfare, independently of the taxing power, has never been authoritatively accepted. Mr. Justice Story points out that if it were adopted "it is obvious that under color of the generality of the words, to 'provide for the common defence and general welfare,' the government of the United States is, in reality, a government of general and unlimited powers, notwithstanding the subsequent enumeration of specific powers." [11] The true construction undoubtedly is that the only thing granted is the power to tax for the purpose of providing funds for payment of the nation's debts and making provision for the general welfare.

Nevertheless the Government asserts that warrant is found in this clause for the adoption of the Agricultural Adjustment Act. The argument is that Congress may appropriate and authorize the spending of moneys for the "general welfare"; that the phrase should be liberally

---

[11] Story, Commentaries on the Constitution of the United States, 5th ed., Vol. I, § 907.

construed to cover anything conducive to national welfare; that decision as to what will promote such welfare rests with Congress alone, and the courts may not review its determination; and finally that the appropriation under attack was in fact for the general welfare of the United States.

The Congress is expressly empowered to lay taxes to provide for the general welfare. Funds in the Treasury as a result of taxation may be expended only through appropriation. (Art. I, § 9, cl. 7.) They can never accomplish the objects for which they were collected unless the power to appropriate is as broad as the power to tax. The necessary implication from the terms of the grant is that the public funds may be appropriated " to provide for the general welfare of the United States." These words cannot be meaningless, else they would not have been used. The conclusion must be that they were intended to limit and define the granted power to raise and to expend money. How shall they be construed to effectuate the intent of the instrument?

Since the foundation of the Nation sharp differences of opinion have persisted as to the true interpretation of the phrase. Madison asserted it amounted to no more than a reference to the other powers enumerated in the subsequent clauses of the same section; that, as the United States is a government of limited and enumerated powers, the grant of power to tax and spend for the general national welfare must be confined to the enumerated legislative fields committed to the Congress. In this view the phrase is mere tautology, for taxation and appropriation are or may be necessary incidents of the exercise of any of the enumerated legislative powers. Hamilton, on the other hand, maintained the clause confers a power separate and distinct from those later enumerated, is not restricted in meaning by the grant of them, and Congress consequently has a substantive power to tax and to ap-

propriate, limited only by the requirement that it shall be exercised to provide for the general welfare of the United States. Each contention has had the support of those whose views are entitled to weight. This court has noticed the question, but has never found it necessary to decide which is the true construction. Mr. Justice Story, in his Commentaries, espouses the Hamiltonian position.[12] We shall not review the writings of public men and commentators or discuss the legislative practice. Study of all these leads us to conclude that the reading advocated by Mr. Justice Story is the correct one. While, therefore, the power to tax is not unlimited, its confines are set in the clause which confers it, and not in those of § 8 which bestow and define the legislative powers of the Congress. It results that the power of Congress to authorize expenditure of public moneys for public purposes is not limited by the direct grants of legislative power found in the Constitution.

But the adoption of the broader construction leaves the power to spend subject to limitations.

As Story says:

"The Constitution was, from its very origin, contemplated to be the frame of a national government, of special and enumerated powers, and not of general and unlimited powers." [13]

Again he says:

"A power to lay taxes for the common defence and general welfare of the United States is not in common sense a general power. It is limited to those objects. It cannot constitutionally transcend them." [14]

That the qualifying phrase must be given effect all advocates of broad construction admit. Hamilton, in his

[12] *Loc. cit.* Chapter XIV, *passim.*

[13] *Loc. cit.* § 909.

[14] *Loc. cit.* § 922.

well known Report on Manufactures, states that the purpose must be "general, and not local." [15]    Monroe, an advocate of Hamilton's doctrine, wrote: "Have Congress a right to raise and appropriate the money to any and to every purpose according to their will and pleasure? They certainly have not." [16]    Story says that if the tax be not proposed for the common defence or general welfare, but for other objects wholly extraneous, it would be wholly indefensible upon constitutional principles. [17]    And he makes it clear that the powers of taxation and appropriation extend only to matters of national, as distinguished from local welfare.

As elsewhere throughout the Constitution the section in question lays down principles which control the use of the power, and does not attempt meticulous or detailed directions.    Every presumption is to be indulged in favor of faithful compliance by Congress with the mandates of the fundamental law.    Courts are reluctant to adjudge any statute in contravention of them.    But, under our frame of government, no other place is provided where the citizen may be heard to urge that the law fails to conform to the limits set upon the use of a granted power.    When such a contention comes here we naturally require a showing that by no reasonable possibility can the challenged legislation fall within the wide range of discretion permitted to the Congress.    How great is the extent of that range, when the subject is the promotion of the general welfare of the United States, we hardly need remark.    But, despite the breadth of the legislative discretion, our duty to hear and to render judgment remains.    If the statute plainly violates the stated principle of the Constitution we must so declare.

[15] Works, Vol. III, p. 250.

[16] Richardson, Messages and Papers of the Presidents, Vol. II, p. 167.

[17] Loc. cit. p. 673.

We are not now required to ascertain the scope of the phrase " general welfare of the United States " or to determine whether an appropriation in aid of agriculture falls within it. Wholly apart from that question, another principle embedded in our Constitution prohibits the enforcement of the Agricultural Adjustment Act. The act invades the reserved rights of the states. It is a statutory plan to regulate and control agricultural production, a matter beyond the powers delegated to the federal government. The tax, the appropriation of the funds raised, and the direction for their disbursement, are but parts of the plan. They are but means to an unconstitutional end.

From the accepted doctrine that the United States is a government of delegated powers, it follows that those not expressly granted, or reasonably to be implied from such as are conferred, are reserved to the states or to the people. To forestall any suggestion to the contrary, the Tenth Amendment was adopted.[18] The same proposition, otherwise stated, is that powers not granted are prohibited. None to regulate agricultural production is given, and therefore legislation by Congress for that purpose is forbidden.

It is an established principle that the attainment of a prohibited end may not be accomplished under the pretext of the exertion of powers which are granted.

" Should Congress, in the execution of its powers, adopt measures which are prohibited by the constitution; or should Congress, under the pretext of executing its powers, pass laws for the accomplishment of objects not intrusted to the government; it would become the painful duty of this tribunal, should a case requiring such a de-

---

[18] The Tenth Amendment declares: " The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively or to the people."

cision come before it, to say that such an act was not the law of the land." *McCulloch* v. *Maryland,* 4 Wheat. 316, 423.

" Congress cannot, under the pretext of executing delegated power, pass laws for the accomplishment of objects not entrusted to the Federal Government. And we accept as. established doctrine that any provision of an act of Congress ostensibly enacted under power granted by the Constitution, not naturally and reasonably adapted to the effective exercise of such power but solely to the achievement of something plainly within power reserved to the States, is invalid and cannot be enforced." *Linder* v. *United States,* 268 U. S. 5, 17.

These principles are as applicable to the power to lay taxes as to any other federal power. Said the court, in *McCulloch* v. *Maryland, supra,* 421:

" Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."

The power of taxation, which is expressly granted, may, of course, be adopted as a means to carry into operation another power also expressly granted. But resort to the taxing power to effectuate an end which is not legitimate, not within the scope of the Constitution, is obviously inadmissible.

" Congress is not empowered to tax for those purposes which are within the exclusive province of the States." *Gibbons* v. *Ogden,* 9 Wheat. 1, 199.

" There are, indeed, certain virtual limitations, arising from the principles of the Constitution itself. It would undoubtedly be an abuse of the [taxing] power if so exercised as to impair the separate existence and independent self-government of the States or if exercised for ends

inconsistent with the limited grants of power in the Constitution." *Veazie Bank* v. *Fenno,* 8 Wall. 533, 541.

In the *Child Labor Tax Case,* 259 U. S. 20, and in *Hill* v. *Wallace,* 259 U. S. 44, this court had before it statutes which purported to be taxing measures. But their purpose was found to be to regulate the conduct of manufacturing and trading, not in interstate commerce, but in the states,—matters not within any power conferred upon Congress by the Constitution—and the levy of the tax a means to force compliance. The court held this was not a constitutional use, but an unconstitutional abuse of the power to tax. In *Linder* v. *United States, supra,* we held that the power to tax could not justify the regulation of the practice of a profession, under the pretext of raising revenue. In *United States* v. *Constantine,* 296 U. S. 287, we declared that Congress could not, in the guise of a tax, impose sanctions for violation of state law respecting the local sale of liquor. These decisions demonstrate that Congress could not, under the pretext of raising revenue, lay a tax on processors who refuse to pay a certain price for cotton, and exempt those who agree so to do, with the purpose of benefiting producers.

*Third.* If the taxing power may not be used as the instrument to enforce a regulation of matters of state concern with respect to which the Congress has no authority to interfere, may it, as in the present case, be employed to raise the money necessary to purchase a compliance which the Congress is powerless to command? The Government asserts that whatever might be said against the validity of the plan if compulsory, it is constitutionally sound because the end is accomplished by voluntary cooperation. There are two sufficient answers to the contention. The regulation is not in fact voluntary. The farmer, of course, may refuse to comply, but the price of such refusal is the loss of benefits. The amount offered is intended to be sufficient to exert pressure on him to

agree to the proposed regulation.[19]   The power to confer or withhold unlimited benefits is the power to coerce or destroy.   If the cotton grower elects not to accept the benefits, he will receive less for his crops; those who receive payments will be able to undersell him.   The result may well be financial ruin.   The coercive purpose and intent of the statute is not obscured by the fact that it has not been perfectly successful.   It is pointed out that, because there still remained a minority whom the rental and benefit payments were insufficient to induce to surrender their independence of action, the Congress has gone further and, in the Bankhead Cotton Act, used the taxing power in a more directly minatory fashion to compel submission.   This progression only serves more fully to expose the coercive purpose of the so-called tax imposed by the present act.   It is clear that the Department of Agriculture has properly described the plan as one to keep a non-cooperating minority in line.   This is coercion by economic pressure.   The asserted power of choice is illusory.

In *Frost Trucking Co.* v. *Railroad Comm'n*, 271 U. S. 583, a state act was considered which provided for supervision and regulation of transportation for hire by automobile on the public highways.   Certificates of convenience and necessity were to be obtained by persons desiring to use the highways for this purpose.   The regulatory

---

[19] U. S. Dept. of Agriculture, Agricultural Adjustment, p. 9.   "Experience of cooperative associations and other groups has shown that without such Government support, the efforts of the farmers to band together to control the amount of their product sent to market are nearly always brought to nothing.   Almost always, under such circumstances, there has been a noncooperating minority, which, refusing to go along with the rest, has stayed on the outside and tried to benefit from the sacrifices the majority has made. . . .   It is to keep this noncooperating minority in line, or at least prevent it from doing harm to the majority, that the power of the Government has been marshaled behind the adjustment programs."

commission required that a private contract carrier should secure such a certificate as a condition of its operation. The effect of the commission's action was to transmute the private carrier into a public carrier. In other words, the privilege of using the highways as a private carrier for compensation was conditioned upon his dedicating his property to the quasi-public use of public transportation. While holding that the private carrier was not obliged to submit himself to the condition, the commission denied him the privilege of using the highways if he did not do so. The argument was, as here, that the carrier had a free choice. This court said, in holding the act as construed unconstitutional:

" If so, constitutional guaranties, so carefully safeguarded against direct assault, are open to destruction by the indirect but no less effective process of requiring a surrender, which, though, in form voluntary, in fact lacks none of the elements of compulsion. Having regard to form alone, the act here is an offer to the private carrier of a privilege, which the state may grant or deny, upon a condition, which the carrier is free to accept or reject. In reality, the carrier is given no choice, except a choice between the rock and the whirlpool,—an option to forego a privilege which may be vital to his livelihood or submit to a requirement which may constitute an intolerable burden." (p. 593.)

But if the plan were one for purely voluntary co-operation it would stand no better so far as federal power is concerned. At best it is a scheme for purchasing with federal funds submission to federal regulation of a subject reserved to the states.

It is said that Congress has the undoubted right to appropriate money to executive officers for expenditure under contracts between the government and individuals; that much of the total expenditures is so made. But appropriations and expenditures under contracts for proper

governmental purposes cannot justify contracts which are not within federal power. And contracts for the reduction of acreage and the control of production are outside the range of that power. An appropriation to be expended by the United States under contracts calling for violation of a state law clearly would offend the Constitution. Is a statute less objectionable which authorizes expenditure of federal moneys to induce action in a field in which the United States has no power to intermeddle? The Congress cannot invade state jurisdiction to compel individual action; no more can it purchase such action.

We are referred to numerous types of federal appropriation which have been made in the past, and it is asserted no question has been raised as to their validity. We need not stop to examine or consider them. As was said in *Massachusetts* v. *Mellon, supra* (p. 487):

". . . as an examination of the acts of Congress will disclose, a large number of statutes appropriating or involving the expenditure of moneys for non-federal purposes have been enacted and carried into effect."

As the opinion points out, such expenditures have not been challenged because no remedy was open for testing their constitutionality in the courts.

We are not here concerned with a conditional appropriation of money, nor with a provision that if certain conditions are not complied with the appropriation shall no longer be available. By the Agricultural Adjustment Act the amount of the tax is appropriated to be expended only in payment under contracts whereby the parties bind themselves to regulation by the Federal Government. There is an obvious difference between a statute stating the conditions upon which moneys shall be expended and one effective only upon assumption of a contractual obligation to submit to a regulation which otherwise could not be enforced. Many examples pointing the distinction might be cited. We are referred to appropriations in aid

of education, and it is said that no one has doubted the power of Congress to stipulate the sort of education for which money shall be expended. But an appropriation to an educational institution which by its terms is to become available only if the beneficiary enters into a contract to teach doctrines subversive of the Constitution is clearly bad. An affirmance of the authority of Congress so to condition the expenditure of an appropriation would tend to nullify all constitutional limitations upon legislative power.

But it is said that there is a wide difference in another respect, between compulsory regulation of the local affairs of a state's citizens and the mere making of a contract relating to their conduct; that, if any state objects, it may declare the contract void and thus prevent those under the state's jurisdiction from complying with its terms. The argument is plainly fallacious. The United States can make the contract only if the federal power to tax and to appropriate reaches the subject matter of the contract. If this does reach the subject matter, its exertion cannot be displaced by state action. To say otherwise is to deny the supremacy of the laws of the United States; to make them subordinate to those of a State. This would reverse the cardinal principle embodied in the Constitution and substitute one which declares that Congress may only effectively legislate as to matters within federal competence when the States do not dissent.

Congress has no power to enforce its commands on the farmer to the ends sought by the Agricultural Adjustment Act. It must follow that it may not indirectly accomplish those ends by taxing and spending to purchase compliance. The Constitution and the entire plan of our government negative any such use of the power to tax and to spend as the act undertakes to authorize. It does not help to declare that local conditions throughout the nation have created a situation of national concern; for this

is but to say that whenever there is a widespread similarity of local conditions, Congress may ignore constitutional limitations upon its own powers and usurp those reserved to the states. If, in lieu of compulsory regulation of subjects within the states' reserved jurisdiction, which is prohibited, the Congress could invoke the taxing and spending power as a means to accomplish the same end, clause 1 of § 8 of Article I would become the instrument for total subversion of the governmental powers reserved to the individual states.

If the act before us is a proper exercise of the federal taxing power, evidently the regulation of all industry throughout the United States may be accomplished by similar exercises of the same power. It would be possible to exact money from one branch of an industry and pay it to another branch in every field of activity which lies within the province of the states. The mere threat of such a procedure might well induce the surrender of rights and the compliance with federal regulation as the price of continuance in business. A few instances will illustrate the thought.

Let us suppose Congress should determine that the farmer, the miner or some other producer of raw materials is receiving too much for his products, with consequent depression of the processing industry and idleness of its employes. Though, by confession, there is no power vested in Congress to compel by statute a lowering of the prices of the raw material, the same result might be accomplished, if the questioned act be valid, by taxing the producer upon his output and appropriating the proceeds to the processors, either with or without conditions imposed as the consideration for payment of the subsidy.

We have held in *Schechter Poultry Corp.* v. *United States,* 295 U. S. 495, that Congress has no power to regulate wages and hours of labor in a local business. If the petitioner is right, this very end may be accomplished by

appropriating money to be paid to employers from the federal treasury under contracts whereby they agree to comply with certain standards fixed by federal law or by contract.

Should Congress ascertain that sugar refiners are not receiving a fair profit, and that this is detrimental to the entire industry, and in turn has its repercussions in trade and commerce generally, it might, in analogy to the present law, impose an excise of two cents a pound on every sale of the commodity and pass the funds collected to such refiners, and such only, as will agree to maintain a certain price.

Assume that too many shoes are being manufactured throughout the nation; that the market is saturated, the price depressed, the factories running half-time, the employes suffering. Upon the principle of the statute in question Congress might authorize the Secretary of Commerce to enter into contracts with shoe manufacturers providing that each shall reduce his output and that the United States will pay him a fixed sum proportioned to such reduction, the money to make the payments to be raised by a tax on all retail shoe dealers or their customers.

Suppose that there are too many garment workers in the large cities; that this results in dislocation of the economic balance. Upon the principle contended for an excise might be laid on the manufacture of all garments manufactured and the proceeds paid to those manufacturers who agree to remove their plants to cities having not more than a hundred thousand population. Thus, through the asserted power of taxation, the federal government, against the will of individual states, might completely redistribute the industrial population.

A possible result of sustaining the claimed federal power would be that every business group which thought itself under-privileged might demand that a tax be laid on its vendors or vendees, the proceeds to be appropriated to the redress of its deficiency of income.

These illustrations are given, not to suggest that any of the purposes mentioned are unworthy, but to demonstrate the scope of the principle for which the Government contends; to test the principle by its applications; to point out that, by the exercise of the asserted power, Congress would, in effect, under the pretext of exercising the taxing power, in reality accomplish prohibited ends. It cannot be said that they envisage improbable legislation. The supposed cases are no more improbable than would the present act have been deemed a few years ago.

Until recently no suggestion of the existence of any such power in the Federal Government has been advanced. The expressions of the framers of the Constitution, the decisions of this court interpreting that instrument, and the writings of great commentators will be searched in vain for any suggestion that there exists in the clause under discussion or elsewhere in the Constitution, the authority whereby every provision and every fair implication from that instrument may be subverted, the independence of the individual states obliterated, and the United States converted into a central government exercising uncontrolled police power in every state of the Union, superseding all local control or regulation of the affairs or concerns of the states.

Hamilton himself, the leading advocate of broad interpretation of the power to tax and to appropriate for the general welfare, never suggested that any power granted by the Constitution could be used for the destruction of local self-government in the states. Story countenances no such doctrine. It seems never to have occurred to them, or to those who have agreed with them, that the general welfare of the United States, (which has aptly been termed " an indestructible Union, composed of indestructible States,") might be served by obliterating the constituent members of the Union. But to this fatal conclu-

sion the doctrine contended for would inevitably lead.
And its sole premise is that, though the makers of the
Constitution, in erecting the federal government, intended
sedulously to limit and define its powers, so as to reserve
to the states and the people sovereign power, to be wielded
by the states and their citizens and not to be invaded by
the United States, they nevertheless by a single clause
gave power to the Congress to tear down the barriers, to
invade the states' jurisdiction, and to become a parliament
of the whole people, subject to no restrictions save such as
are self-imposed. The argument when seen in its true
character and in the light of its inevitable results must be
rejected.

Since, as we have pointed out, there was no power in
the Congress to impose the contested exaction, it could
not lawfully ratify or confirm what an executive officer
had done in that regard. Consequently the Act of 1935
does not affect the rights of the parties.

The judgment is

*Affirmed.*

MR. JUSTICE STONE, dissenting.

I think the judgment should be reversed.

The present stress of widely held and strongly ex-
pressed differences of opinion of the wisdom of the
Agricultural Adjustment Act makes it important, in the
interest of clear thinking and sound result, to emphasize
at the outset certain propositions which should have con-
trolling influence in determining the validity of the Act.
They are:

1. The power of courts to declare a statute unconsti-
tutional is subject to two guiding principles of decision
which ought never to be absent from judicial conscious-
ness. One is that courts are concerned only with the
power to enact statutes, not with their wisdom. The
other is that while unconstitutional exercise of power

by the executive and legislative branches of the government is subject to judicial restraint, the only check upon our own exercise of power is our own sense of self-restraint. For the removal of unwise laws from the statute books appeal lies not to the courts but to the ballot and to the processes of democratic government.

2. The constitutional power of Congress to levy an excise tax upon the processing of agricultural products is not questioned. The present levy is held invalid, not for any want of power in Congress to lay such a tax to defray public expenditures, including those for the general welfare, but because the use to which its proceeds are put is disapproved.

3. As the present depressed state of agriculture is nation wide in its extent and effects, there is no basis for saying that the expenditure of public money in aid of farmers is not within the specifically granted power of Congress to levy taxes to " provide for the . . . general welfare." The opinion of the Court does not declare otherwise.

4. No question of a variable tax fixed from time to time by fiat of the Secretary of Agriculture, or of unauthorized delegation of legislative power, is now presented. The schedule of rates imposed by the Secretary in accordance with the original command of Congress has since been specifically adopted and confirmed by Act of Congress, which has declared that it shall be the lawful tax. Act of August 24, 1935, 49 Stat. 750. That is the tax which the government now seeks to collect. Any defects there may have been in the manner of laying the tax by the Secretary have now been removed by the exercise of the power of Congress to pass a curative statute validating an intended, though defective, tax. *United States* v. *Heinszen & Co.*, 206 U. S. 370; *Graham & Foster* v. *Goodcell*, 282 U. S. 409; cf. *Milliken* v. *United States*, 283 U. S. 15. The Agricultural Adjustment Act as thus amended de-

clares that none of its provisions shall fail because others are pronounced invalid.

It is with these preliminary and hardly controverted matters in mind that we should direct our attention to the pivot on which the decision of the Court is made to turn. It is that a levy unquestionably within the taxing power of Congress may be treated as invalid because it is a step in a plan to regulate agricultural production and is thus a forbidden infringement of state power. The levy is not any the less an exercise of taxing power because it is intended to defray an expenditure for the general welfare rather than for some other support of government. Nor is the levy and collection of the tax pointed to as effecting the regulation. While all federal taxes inevitably have some influence on the internal economy of the states, it is not contended that the levy of a processing tax upon manufacturers using agricultural products as raw material has any perceptible regulatory effect upon either their production or manufacture. The tax is unlike the penalties which were held invalid in the *Child Labor Tax Case,* 259 U. S. 20, in *Hill* v. *Wallace,* 259 U. S. 44, in *Linder* v. *United States,* 268 U. S. 5, 17, and in *United States* v. *Constantine,* 296 U. S. 287, because they were themselves the instruments of regulation by virtue of their coercive effect on matters left to the control of the states. Here regulation, if any there be, is accomplished not by the tax but by the method by which its proceeds are expended, and would equally be accomplished by any like use of public funds, regardless of their source.

The method may be simply stated. Out of the available fund payments are made to such farmers as are willing to curtail their productive acreage, who in fact do so and who in advance have filed their written undertaking to do so with the Secretary of Agriculture. In saying that this method of spending public moneys is an invasion of the reserved powers of the states, the Court does not assert

that the expenditure of public funds to promote the general welfare is not a substantive power specifically delegated to the national government, as Hamilton and Story pronounced it to be. It does not deny that the expenditure of funds for the benefit of farmers and in aid of a program of curtailment of production of agricultural products, and thus of a supposedly better ordered national economy, is within the specifically granted power. But it is declared that state power is nevertheless infringed by the expenditure of the proceeds of the tax to compensate farmers for the curtailment of their cotton acreage. Although the farmer is placed under no legal compulsion to reduce acreage, it is said that the mere offer of compensation for so doing is a species of economic coercion which operates with the same legal force and effect as though the curtailment were made mandatory by Act of Congress. In any event it is insisted that even though not coercive the expenditure of public funds to induce the recipients to curtail production is itself an infringement of state power, since the federal government cannot invade the domain of the states by the " purchase " of performance of acts which it has no power to compel.

Of the assertion that the payments to farmers are coercive, it is enough to say that no such contention is pressed by the taxpayer, and no such consequences were to be anticipated or appear to have resulted from the administration of the Act. The suggestion of coercion finds no support in the record or in any data showing the actual operation of the Act. Threat of loss, not hope of gain, is the essence of economic coercion. Members of a long depressed industry have undoubtedly been tempted to curtail acreage by the hope of resulting better prices and by the proffered opportunity to obtain needed ready money. But there is nothing to indicate that those who accepted benefits were impelled by fear of lower prices if they did not accept, or that at any stage in the operation

of the plan a farmer could say whether, apart from the certainty of cash payments at specified times, the advantage would lie with curtailment of production plus compensation, rather than with the same or increased acreage plus the expected rise in prices which actually occurred. Although the Agricultural Adjustment Act was put into operation in June, 1933, the official reports of the Department of Agriculture show that 6,343,000 acres of productive cotton land, 14% of the total, did not participate in the plan in 1934, and 2,790,000 acres, 6% of the total, did not participate in 1935. Of the total number of farms growing cotton, estimated at 1,500,000, 33% in 1934 and 13% in 1935 did not participate.

It is significant that in the congressional hearings on the bill that became the Bankhead Act, 48 Stat. 598, as amended by Act of June 20, 1934, 48 Stat. 1184, which imposes a tax of 50% on all cotton produced in excess of limits prescribed by the Secretary of Agriculture, there was abundant testimony that the restriction of cotton production attempted by the Agricultural Adjustment Act could not be secured without the coercive provisions of the Bankhead Act. See Hearing before Committee on Agriculture, U. S. Senate, on S. 1974, 73rd Cong., 2nd Sess.; Hearing before Committee on Agriculture, U. S. House of Representatives, on H. R. 8402, 73rd Cong., 2nd Sess. The Senate and House Committees so reported, Senate Report No. 283, 73rd Cong., 2nd Sess., p. 3; House Report No. 867, 73rd Cong., 2nd Sess., p. 3. The Report of the Department of Agriculture on the administration of the Agricultural Adjustment Act (February 15, 1934 to December 31, 1934), p. 50, points out that the Bankhead Act was passed in response to a strong sentiment in favor of mandatory production control " that would prevent noncooperating farmers from increasing their own plantings in order to capitalize upon the price advances that had resulted from the reductions made by contract

signers."[1]   The presumption of constitutionality of a statute is not to be overturned by an assertion of its coercive effect which rests on nothing more substantial than groundless speculation.

It is upon the contention that state power is infringed by purchased regulation of agricultural production that chief reliance is placed. It is insisted that, while the Constitution gives to Congress, in specific and unambiguous terms, the power to tax and spend, the power is subject to limitations which do not find their origin in any express provision of the Constitution and to which other expressly delegated powers are not subject.

The Constitution requires that public funds shall be spent for a defined purpose, the promotion of the general welfare. Their expenditure usually involves payment on terms which will insure use by the selected recipients within the limits of the constitutional purpose. Expenditures would fail of their purpose and thus lose their constitutional sanction if the terms of payment were not such that by their influence on the action of the recipients the permitted end would be attained. The power of Congress to spend is inseparable from persuasion to action over which Congress has no legislative control. Congress may not command that the science of agriculture be taught in state universities. But if it would aid the teaching of that science by grants to state institutions, it is appropriate, if not necessary, that the grant be on the condition, incorporated in the Morrill Act, 12 Stat. 503, 26 Stat. 417, that it be used for the intended purpose. Similarly it would seem to be compliance with the Constitution, not violation of it, for the government to take and the university to-give a contract that the grant would be so used. It makes no dif-

---

[1] Whether coercion was the sole or the dominant purpose of the Bankhead Act, or whether the act was designed also for revenue or other legitimate ends, there is no occasion to consider now.

ference that there is a promise to do an act which the condition is calculated to induce. Condition and promise are alike valid since both are in furtherance of the national purpose for which the money is appropriated.

These effects upon individual action, which are but incidents of the authorized expenditure of government money, are pronounced to be themselves a limitation upon the granted power, and so the time-honored principle of constitutional interpretation that the granted power includes all those which are incident to it is reversed. "Let the end be legitimate," said the great Chief Justice, "let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the Constitution, are constitutional." *McCulloch* v. *Maryland,* 4 Wheat. 316, 421. This cardinal guide to constitutional exposition must now be re-phrased so far as the spending power of the federal government is concerned. Let the expenditure be to promote the general welfare, still, if it is needful in order to insure its use for the intended purpose to influence any action which Congress cannot command because within the sphere of state government, the expenditure is unconstitutional. And taxes otherwise lawfully levied are likewise unconstitutional if they are appropriated to the expenditure whose incident is condemned.

Congress through the Interstate Commerce Commission has set aside intrastate railroad rates. It has made and destroyed intrastate industries by raising or lowering tariffs. These results are said to be permissible because they are incidents of the commerce power and the power to levy duties on imports. See *Minnesota Rate Cases,* 230 U. S. 352; *Shreveport Case,* 234 U. S. 342; *Board of Trustees of the University of Illinois* v. *United States,* 289 U. S. 48. The only conclusion to be drawn is that re-

sults become lawful when they are incidents of those powers but unlawful when incident to the similarly granted power to tax and spend.

Such a limitation is contradictory and destructive of the power to appropriate for the public welfare, and is incapable of practical application. The spending power of Congress is in addition to the legislative power and not subordinate to it. This independent grant of the power of the purse, and its very nature, involving in its exercise the duty to insure expenditure within the granted power, presuppose freedom of selection among divers ends and aims, and the capacity to impose such conditions as will render the choice effective. It is a contradiction in terms to say that there is power to spend for the national welfare, while rejecting any power to impose conditions reasonably adapted to the attainment of the end which alone would justify the expenditure.

The limitation now sanctioned must lead to absurd consequences. The government may give seeds to farmers, but may not condition the gift upon their being planted in places where they are most needed or even planted at all. The government may give money to the unemployed, but may not ask that those who get it shall give labor in return, or even use it to support their families. It may give money to sufferers from earthquake, fire, tornado, pestilence or flood, but may not impose conditions—health precautions designed to prevent the spread of disease, or induce the movement of population to safer or more sanitary areas. All that, because it is purchased regulation infringing state powers, must be left for the states, who are unable or unwilling to supply the necessary relief. The government may spend its money for vocational rehabilitation, 48 Stat. 389, but it may not, with the consent of all concerned, supervise the process which it undertakes to aid. It may spend its money for the suppression of the boll weevil, but may

not compensate the farmers for suspending the growth of cotton in the infected areas. It may aid state reforestation and forest fire prevention agencies, 43 Stat. 653, but may not be permitted to supervise their conduct. It may support rural schools, 39 Stat. 929, 45 Stat. 1151, 48 Stat. 792, but may not condition its grant by the requirement that certain standards be maintained. It may appropriate moneys to be expended by the Reconstruction Finance Corporation " to aid in financing agriculture, commerce and industry," and to facilitate " the exportation of agricultural and other products." Do all its activities collapse because, in order to effect the permissible purpose, in myriad ways the money is paid out upon terms and conditions which influence action of the recipients within the states, which Congress cannot command? The answer would seem plain. If the expenditure is for a national public purpose, that purpose will not be thwarted because payment is on condition which will advance that purpose. The action which Congress induces by payments of money to promote the general welfare, but which it does not command or coerce, is but an incident to a specifically granted power, but a permissible means to a legitimate end. If appropriation in aid of a program of curtailment of agricultural production is constitutional, and it is not denied that it is, payment to farmers on condition that they reduce their crop acreage is constitutional. It is not any the less so because the farmer at his own option promises to fulfill the condition.

That the governmental power of the purse is a great one is not now for the first time announced. Every student of the history of government and economics is aware of its magnitude and of its existence in every civilized government. Both were well understood by the framers of the Constitution when they sanctioned the grant of the spending power to the federal government, and both were recognized by Hamilton and Story, whose views of the

spending power as standing on a parity with the other powers specifically granted, have hitherto been generally accepted.

The suggestion that it must now be curtailed by judicial fiat because it may be abused by unwise use hardly rises to the dignity of argument. So may judicial power be abused. "The power to tax is the power to destroy," but we do not, for that reason, doubt its existence, or hold that its efficacy is to be restricted by its incidental or collateral effects upon the states. See *Veazie Bank* v. *Fenno,* 8 Wall. 533; *McCray* v. *United States,* 195 U. S. 27; compare *Magnano Co.* v. *Hamilton,* 292 U. S. 40. The power to tax and spend is not without constitutional restraints. One restriction is that the purpose must be truly national. Another is that it may not be used to coerce action left to state control. Another is the conscience and patriotism of Congress and the Executive. "It must be remembered that legislators are the ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts." Justice Holmes, in *Missouri, Kansas & Texas Ry. Co.* v. *May,* 194 U. S. 267, 270.

A tortured construction of the Constitution is not to be justified by recourse to extreme examples of reckless congressional spending which might occur if courts could not prevent — expenditures which, even if they could be thought to effect any national purpose, would be possible only by action of a legislature lost to all sense of public responsibility. Such suppositions are addressed to the mind accustomed to believe that it is the business of courts to sit in judgment on the wisdom of legislative action. Courts are not the only agency of government that must be assumed to have capacity to govern. Congress and the courts both unhappily may falter or be mistaken in the performance of their constitutional duty. But interpretation of our great charter of government which proceeds on any assumption that the responsibility for the preservation of our institutions is the exclusive

concern of any one of the three branches of government, or that it alone can save them from destruction is far more likely, in the long run, "to obliterate the constituent members" of "an indestructible union of indestructible states" than the frank recognition that language, even of a constitution, may mean what it says: that the power to tax and spend includes the power to relieve a nation-wide economic maladjustment by conditional gifts of money.

MR. JUSTICE BRANDEIS and MR. JUSTICE CARDOZO join in this opinion.