ALTON R. CO. et al. (BAILEY et al. Inter-·veners) v. RAILROAD RETIREMENT BOARD et al.

No. 60397.

District Court of the United States for the District of Columbia.

June 26, 1936.

Sydney R. Prince and Sidney S. Alderman, both of Washington, D. C., Jacob Aronson, of New York City, Robert V. Fletcher, of Washington, D. C., Edward S. Jouett, of Louisville, Ky., Dennis F. Lyons, of St. Paul, Minn., and Emmett E. McInnis, of Chicago, Ill., for plaintiffs.

R. Granville Curry and Frederick M. Dolan, both of Washington, D. C., for interveners.

Leslie C. Garnett, U. S. Atty., and Harry L. Underwood, Asst. U. S. Atty., both of Washington, D. C., and Charles M. Hay and Walter H. Pollak, Sp. Assts. to Atty. Gen. (Samuel J. Silverman, of New York City, Stewart D. Flanagan, of St. Louis, Mo., Russell H. Matthias, of Chicago, Ill., and Ruth R. Kessler, of New York City, of counsel), for defendants.

BAILEY, Justice.

On August 29, 1935, the President approved two acts of Congress, one "To establish a retirement system for employees of carriers subject to the Interstate Commerce Act, and for other purposes" (49 Stat. 967 [45 U.S.C.A. § 215 et seq.; 42 U.S.C.A. § 410a]), and the other "To levy an excise tax upon carriers and an income tax upon their employees" (49 Stat. 974 [45 U.S.C.A. § 241 et seq.]). The latter act provides that there shall be levied upon the income of every employee of these carriers $3\frac{1}{2}$ per centum of the compensation of such employee, not in excess of $300 per month, received by him, and that this tax shall be collected by the employer, by deducting it from the compensation of the employee. It further levies an excise tax

upon the carrier of 3½ per centum of the compensation not in excess of $300 per month paid by it to its employees.

■ The plaintiff carriers and certain employees of the Atlantic Coast Line Company who have intervened contend that this tax upon them is arbitrary, capricious, and whimsical, and deprives them of their property without due process of law. It is not apparent from the act itself what is the basis of its unusual provisions. The tax is in addition to other taxes; it is levied upon railroad companies and their employees, and upon no other class, with the exception of certain officers of labor organizations. The income tax is laid upon the amount of employees' salaries not in excess of $300 per month, and all sums in excess of that amount are exempt. It bears harder upon low salaries than upon those that are higher, and is thus contrary to all principles which have heretofore been followed in the levying of income taxes. Some two months before the passage of this act the President declared in a message to Congress: "With the enactment of the income-tax law of 1913 the Federal Government began to apply effectively the widely accepted principle that taxes should be levied in proportion to ability to pay and in proportion to benefits received. Income was wisely chosen as the measure of benefits and of ability to pay. This was and still is a wholesome guide for national policy. It should be retained as the governing principle of Federal taxation." (H.Doc.No.229, 74th Congress.)

The basis of measurement of the amount of the tax upon the carriers does not appear from the act, nor why a tax should be levied upon the carriers and their employees and upon no other class of employers or employees, nor why the amount of the excise tax should be based upon the amount paid to employees not in excess of $300 per month. "That a federal statute passed under the taxing power may be so arbitrary and capricious as to cause it to fall before the due process of law clause of the Fifth Amendment is settled." Heiner v. Donnan, 285 U.S. 312, 326, 52 S.Ct. 358, 361, 76 L.Ed. 772. And such would seem to be the character of this tax, were the court confined in its consideration to the taxing act itself.

When, however, the act to establish a railroad retirement system, approved on the same day as the taxing act, is considered in connection with 'it, the reasons for the peculiar provisions of the taxing act are apparent. The two taken together so dovetail into one another as to create a complete system, substantially the same as that created by the Railroad Retirement Act of 1934 (48 Stat. 1283), held unconstitutional by the Supreme Court in Railroad Retirement Board v. Alton Railroad Co., 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468. It is true, as claimed by the defendants, that the tax act is apparently based on the power of Congress to levy taxes to promote the general welfare and for the common defense, and also upon the power to regulate commerce (the latter being the power invoked in the act of 1934).

The provisions of the two acts in question are so interrelated and interdependent that each is a necessary part of one entire scheme. This is not only apparent from the terms of the acts themselves but is shown by their legislative history. It was clearly the intention of Congress that the pension system created by the Retirement Act should be supported by the taxes levied upon the carriers and their employees. Senator Wagner spoke for the Senate committee in reporting its favorable recommendation of the Retirement Act.

He referred to the tax bill, pointing out that it was not at that time before the Senate but was pending in the Finance Committee. This led to the following colloquy:

"Mr. Byrnes. Should such a bill ever be passed, the revenue would go into the general fund of the Treasury?

"Mr. Wagner. Yes; and then, may I say to the Senator, the government will pay no part of the expense of the annuities." (Cong.Rec. vol. 79, 13646; Pamphlet 14114.)

"Mr. Hasting. Does the Senator agree that the Court may take judicial notice of the taxing act when the other is being tested, or vice versa?

"Mr. Wagner. Of course, it would be obvious in the act itself?" (Cong.Rec. vol. 79, 13647; Pamphlet 14116.)

Section 6 (b) of the Retirement Act (45 U.S.C.A. § 220 (b) provides that the Board " * * * at intervals of not more than two years shall cause to be made actuarial surveys and analyses, to determine from time to time the payments to be required to provide for all annuities,

other disbursements, and expenses, and to assure proper administration and the adequacy and permanency of the retirement system hereby established."

Senator Wagner said: "The calculations are definitely made; they are predictable as to the amount which will be required in order to secure a solvent fund for the payment of these pensions; and a sufficient tax is imposed to secure that fund. So whether it be segregated or put into the general fund of the treasury is really a very minor matter." (Cong.Rec. vol. 79, 13649; Pamphlet 14117, 14118.)

The defendants claim that the court, in determining the constitutionality of the taxing act, cannot take into consideration the provisions of the Retirement Act, that the funds arising from the taxing act are not "ear marked," not kept as a separate fund for the payment of the pensions provided for in the Retirement Act, and, so far as the constitutionality of the taxing act is concerned, its provisions alone can be considered. But, apart from any question whether the tax act is so arbitrary and capricious when taken out of its setting as to be an unconstitutional taking of property without due process of law, the purpose of Congress in passing it is clearly as shown above to provide funds for pensions under the Retirement Act, and not to provide for the expenses of the government. If the effect of the two acts taken together is to take the property of one class for the benefit of another, and the taxing act was not intended to provide for the expense of government, but solely for a purpose which the Supreme Court has held not to be within the domain of the federal government, it would seem to be immaterial whether the funds raised by the tax act are to be segregated in the Treasury; that would be a mere matter of bookkeeping, and would not affect the right of the taxpayer. This view is supported also by the proceedings in Congress bearing on these two acts.

Senator Wagner said: "Mr. President, it was pointed out when the social-security bill was under consideration that the provision under discussion was merely a matter of bookkeeping. The calculations are definitely made; they are predictable as to the amount which will be required in order to secure a solvent fund for the payment of these pensions; and a sufficient tax is imposed to secure that fund. So whether it be segregated or put it into the general fund of the treasury is really a very minor matter." (Cong.Rec. vol. 79, p. 13649.)

"Mr. Tydings. I take it the Senator would have no particular objection to segregating these funds under the Railroad Retirement Board?

"Mr. Wagner. I should want to consult the Treasury authorities. I think perhaps such segregation would impose upon the Treasury Department unnecessary bookkeeping and unnecessary work. It is a matter that I do not regard as very important, so long as the calculations are definitely made, and that can be done. It is done by every insurance company in the United States. We do that again and again; there is no difficulty about it." (Cong.Rec. vol. 79; Pamphlet 14118.)

The defendants rely largely upon the decision of the Supreme Court in Knights v. Jackson, 260 U.S. 12, 43 S.Ct. 1, 67 L. Ed. 102, where the court declared that it could not connect a Massachusetts statute increasing a general income tax with an act directing the payment for educational purposes of certain sums to cities and towns out of the proceeds of the entire income tax. The court held ·that the use of the proceeds of the tax for educational purposes was not unlawful, and that the two acts could not be connected for the purpose of attributing to the Legislature an attempt to achieve by indirection a result supposed to be beyond its power. In the case at bar, however, the interlocking and interdependent provisions of the two acts and their legislative history do show an attempt by Congress to accomplish under certain of its powers an end which has been held to be unconstitutional. Of course, Congress may accomplish under one power that which it may not do under another, but here it is evident that the use of the taxing power is to accomplish that which is beyond its powers. As was said by the Supreme Court in United States v. Butler, 297 U.S. 1, 61, 56 S.Ct. 312, 317, 80 L.Ed. 477, 102 A.L.R. 914: "The exaction cannot be wrested out of its setting, denominated an excise for raising revenue and legalized by ignoring its purpose as a mere instrumentality for bringing about a desired end. To do this would be to shut our eyes to what all others than we can see · and understand."

In Hepburn v. Griswold, 8 Wall. 603, 623, 19 L.Ed. 513, the court said, referring to the Fifth Amendment: "It does not, in

terms, prohibit legislation which appropriates the private property of one class of citizens to the use of another class; but if such property cannot be taken for the benefit of all, without compensation, it is difficult to understand how it can be so taken for the benefit of a part without violating the spirit of the prohibition."

The court has held that, so far as the system of pensions created by the act of 1934 is concerned, there is no "power of legislative regulation."

The defendants contend that the act of 1934 provided for permanent contributions from the carriers and employees, while the tax act of 1935 is temporary in its nature. But the provision in the Retirement Act for "actuarial surveys," and the legislative history of the two acts show the purpose of Congress to establish a permanent system.

■ I think that from what has been said it necessarily follows that the two acts are inseparable parts of a whole, that Congress would not have enacted one without the other, that the taxes levied under the tax act are the contributions required under the act of 1934, and that to hold otherwise would, in the language of the Supreme Court in the Butler Case, "shut our (my) eyes to what all others than we (I) can see and understand."

This being true, it is clear that under the views of the Supreme Court in the Alton Case the taxing act transcends the powers of Congress. The pension system so created is substantially the same as that created by the act of 1934, and, apart from its unconstitutionality as a whole, subject to the same objections in certain particulars as those pointed out by the Supreme Court in that case.

Were it not for the fact that the defendants have introduced a large amount of testimony in the effort to disprove certain conclusions reached by the court in that case, it would hardly be necessary to discuss any of those questions.

It is unquestionably true that the carriers are engaged in the public service and one indispensable to the general welfare and the common defense; that as men grow old their physical powers decrease, and their mental powers also; that, largely due to the seniority system in force with many of the carriers taken in connection with the recent depression, there has been in recent years an increase in the average age of railway employees, and the defendants contend that, in view of the increasing speed in transportation, the older men are not so well fitted for the duties now being imposed upon them; and that a pension system is a reasonable method of reducing superannuation. On the other hand, however, it is no less true that the capacity to perform duties once learned does not decrease with age so rapidly as does the capacity to learn new duties; that experience and the added caution attendant with it tend to promote safety as well as efficiency.

Testimony has also been offered to show that, since the adoption by the government of a compulsory system of pensions in the railway mail service, the efficiency of the employees has been increased. The plaintiffs, however, have offered testimony to show that, despite the increase in speed of trains in recent years, and the increasing age of employees, there has been a decrease in the number of injuries to its employees and to passengers per man hour. How much either of these results has been reached by improvements in management or in system or through the use of safer devices or equipment is not apparent, but it cannot be said that the increase in the average age of railway employees has resulted in any greater danger to the employees or to passengers upon the railroads.

It may be that men would be more willing to undertake the duties now performed by the employees of the carriers and with the intention of making that employment a permanent occupation were they assured of a permanent livelihood in their old age and not have to rely upon a pension dependent upon the will of their employers.

■ But whether the findings of the Supreme Court in the Alton Case are findings of fact based upon the record in that case or upon facts of which that court took judicial knowledge, it would require evidence, practically conclusive in its nature, to justify a trial court in making findings that were not in consonance with those of the Supreme Court. No such situation exists in the case at bar. The evidence is conflicting as to many questions of fact and, whatever might be my individual views, I am bound by the decision in that case, which disposes of any question as to the validity of a compulsory pension system based in part upon enforced contribu-

tions from the carriers, and I feel that I am constrained therefore to hold that the tax act is unconstitutional as applied to the carriers.

As to the questions raised by the intervening employees of the Atlantic Coast Line Company: The decision in the first Alton Case apparently does not pass upon the question whether a compulsory retirement system, financed in whole or in part by compulsory contributions from the employees themselves would be unconstitutional. The system set up by the two acts in question here, however, seems to be subject to many of the constitutional objections raised by the Supreme Court in the Alton Case, notably in the reduced annuities if the employee wishes to continue in service after reaching the age of sixty-five; the provision as to payment to persons who have reached the age of sixty-five, at the date of enactment of the Retirement Act; and provisions for retirement of those whose services have been performed before the date of the act, and who may have contributed nothing in support of the retirement system.

In addition to this, it is clear from the statements of those in charge of the two bills that Congress did not intend to enact them, if the expense was not to be borne in part by the carriers, and that no part of the burden should rest upon the government.

The defendants have moved to dismiss both the bill and the intervening petition upon the ground that equity has no jurisdiction, relying upon R.S. § 3224 (26 U.S.C.A. § 1543): "No suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court."

The Supreme Court has held where the remedy at law is sufficient the act controls, but that "in cases where complainant shows that in addition to the illegality of an exaction in the guise of a tax there exist special and extraordinary circumstances sufficient to bring the case within some acknowledged head of equity jurisprudence, a suit may be maintained to enjoin the collector." Miller v. Standard Nut Margarine Company, 284 U.S. 498, 52 S.Ct. 260, 263, 76 L.Ed. 422.

I think that the case at bar presents extraordinary circumstances, rendering relief in equity necessary. It is clear that, if this tax be illegal, the carriers will suffer irreparable loss. There will be serious disruption in the relations between the carriers and their employees. Many employees will have relinquished their employment with the carriers within the next year, upon the assumption of the permanency of their annuities provided for in the Retirement Act, and their positions will be filled by others. Rate adjustments may depend upon the validity of the tax. Reorganization plans will be delayed. Great accounting expense will be imposed upon the carriers, and this will be necessary from the fact that exact records are available only in the offices of the carriers. The cost of this will approximate some $700,000, and this sum would be entirely lost if the tax should hereafter be declared illegal in an action at law.

For these reasons I think that equity has jurisdiction of this suit.

The plaintiffs have moved to strike certain testimony introduced by the defendants, and the latter have moved to strike certain testimony offered by the plaintiffs. While certain of the matters brought out by the defendants' questionnaires are, I think, incompetent, they have had no influence on my decision, and, without going into detail as to my reasons, I overrule both motions, largely because I think the testimony objected to is of slight materiality.

The defendants the Railroad Retirement Board and its individual members will be enjoined from making any order, or from instituting or taking any step toward the institution of any actions, proceedings, or prosecutions, designed to compel plaintiffs or their officers or any of them to assemble, compile, or furnish any of the information and records required, or which may be required, to be furnished under said Retirement Act.

And the defendant Guy T. Helvering, individually and as Commissioner of Internal Revenue, will be enjoined from making any order and from instituting or taking any steps toward the institution of any actions, proceedings, or prosecutions designed to compel plaintiffs or their officers or any of them or the interveners to pay any amount pursuant to the tax act, and from demanding, collecting, or attempting to collect, any such amount from plaintiffs or the interveners or any of them.