## CONSOLIDATED FLOUR MILLS v. PH. ORTH CO.

### No. 7120.

Circuit Court of Appeals, Seventh Circuit.

Oct. 12, 1940.

Chas. A. Riedl, of Milwaukee, Wis., for appellant.

Herbert J. Campbell, of Chicago, Ill., and Bert Vandervelde, of Milwaukee, Wis., for appellee.

Before SPARKS and KERNER, Circuit Judges, and BRIGGLE, District Judge.

KERNER, Circuit Judge.

The Consolidated Flour Mills Company of Kansas brought this action to compel payment for flour delivered to the Ph. Orth Company of Wisconsin. The Wisconsin company made counterclaim to moneys which were included in the price of flour purchased under former executed contracts and were paid to cover processing taxes levied pursuant to the Agricultural Adjustment Act. The District Court favored plaintiff's complaint, dismissed defendant's counterclaim and rendered judgment accordingly. From this judgment the defendant appealed.

In 1933 Congress passed the Agricultural Adjustment Act which primarily imposed a tax upon the processing of agricultural commodities. 48 Stat. 31, 35, 7 U.S.C.A. § 609 et seq. According to this statute the processor was the taxpayer even though he might pass the burden of the tax on to his vendee. Oswald Jaeger Baking Co. v. Commissioner, 7 Cir., 108 F.2d 375, certiorari denied, 309 U.S. 683, 60 S.Ct. 723, 84 L.Ed. 1027. The amount of the tax was determined by the Secretary of Agriculture to be thirty cents on each bushel of wheat purchased. But in some cases it was necessary to establish a conversion factor which could be used in lieu of the thirty cents per bushel of wheat. For instance, the statute provided for refunds in situations where the processor who had already paid his thirty cents tax sold flour to a charitable organization. 48 Stat. 39, 7 U.S.C.A. § 615(c). The amount of the refund was computed by use of the conversion factor which was determined by the Secretary of Agriculture to be 4.6 bushels of wheat as equaling a barrel of flour or $1.38 per barrel.

The plaintiff is a milling company and during the course of its business engages in various processing operations which eventually convert wheat into flour. After 1933 the plaintiff as a processor and taxpayer was required to pay a tax of thirty cents for every bushel of wheat which it ground into flour, and this tax became a part of the cost of doing business. In 1934 and 1935 the defendant who is a jobber or flour distributor entered into four written contracts for the purchase of plaintiff's flour. In each instance the flour was shipped from plaintiff's Kansas plant "f. o. b. * * * shipping point" and the defendant paid the contract price thereof upon arrival at destination. Subsequently the defendant sold this flour to the baking trade and admits that it did not bear the processing tax burden but that it passed the burden on to the bakers.

The four contracts in question described quantities purchased, set forth prices paid and related to the incidence of the processing taxes. Each contract contained the provision that "This contract constitutes the complete agreement between the parties hereto and cannot be changed in any manner whatsoever without the written consent of both buyer and seller." The only price stated in the contracts or in the invoices was the purchase price—the price per barrel of flour. These contracts also declared that the purchase price reflected the amount of processing tax paid by the vendor and provided against the contingency of an increase or decrease in the tax.[1] No mention was made therein as to the amount of

---

[1] The first three contracts contained the following tax provision: "Taxes: The price named in this contract includes all taxes * * * [levied under] the Agricultural Adjustment Act. * * * Under this Act it is provided that said taxes may be changed from time to time. * * * It is, therefore, agreed and understood that if, after the date of this contract, * * * [there is] any increase in taxes or * * * additional tax or taxes other than those included in the price hereof * * * then, in that event, said increases or additional taxes shall be added to the price hereof; and

correspondingly if any tax included in the price hereof shall be decreased or abated, then, in that event, said decrease or abatement shall be deducted from the price hereof."

The last contract had the following tax clause: "The prices named in this contract include the processing taxes as now imposed * * * and if any increase in the processing taxes as now imposed shall become effective [before the contract executed] * * * the amount thereof shall be paid by the Buyer in addition to the contract prices herein specified. * * * Any decrease in the processing taxes as

processing tax included. in the purchase price.

The plaintiff paid the processing taxes levied under the Agricultural Adjustment Act until May 1, 1935. From this date until January 6, 1936 the Collector of Internal Revenue was restrained from collection of these taxes by injunctive order and the tax money accruing was impounded in court. On January 6, 1936 the Supreme Court declared the Agricultural Adjustment Act unconstitutional, United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A. L.R. 914, and the impounded money was returned to the plaintiff. On June 22, 1936 Congress enacted a Windfall Tax statute which imposed an 80% tax on net income resulting to the processor who had shifted the burden of uncollected processing taxes to his vendee, and a refund statute which provided for the refund of collected processing taxes to the processor who had not shifted the tax burden to his vendee. 49 Stat. 1734; 49 Stat. 1747, 26 U.S.C.A. Int. Rev.Code, § 700 et seq., 7 U.S.C.A. § 644 et seq.

In 1936 the defendant again contracted for the purchase of plaintiff's flour. The flour was delivered and accepted but not paid for, whereupon the plaintiff sued to compel payment. To plaintiff's complaint the defendant made a counterclaim which asserted its legal right to that part of the purchase price of the 1934 and 1935 contracts which reflected the taxes levied pursuant to the Agricultural Adjustment Act. The defendant based its claim thereto on one or the other of the following theories: (1) an agreement by the plaintiff to refund to or to reimburse the defendant in the event the processing tax was invalidated; and (2) the circumstances giving rise to a constructive trust for the use and benefit of the defendant. The court granted judgment to the plaintiff. The defendant appealed from that part of the judgment dismissing the counterclaim and that part of the judgment dealing with the computation of interest.

Between October 10 and October 17 of 1934 there was an exchange of correspondence between the parties to this controversy. The defendant submitted to the plaintiff a copy of an agreement which it had with another milling company and which was considered by them "as part of any contract heretofore or hereafter made by us for the sale of wheat flour." This agreement protected the processor's customers against judicial invalidation of the Agricultural Adjustment Act by providing for reimbursement to the customers in case of invalidation and subsequent refund by the government. The defendant wanted to know "what we may expect in our dealings with you." The plaintiff replied that "The 'agreement' submitted to you by our brother miller is, to our notion, merely sales and good will promotion. * * * Always in the past [there has been] * * * concerted action on the part of the millers. Regardless of whether the act is found unconstitutional or whether the processing tax is reduced * * *, you can rest assured that the milling industry will act as a unit. The contract which you have signed will not protect you to any greater extent than if you had no contract."

Between October 17 and November 22 of 1934 there was a long distance telephone call between Philip Orth, Jr. of the defendant company and Wiley T. Hawkins of the plaintiff company. Orth testified that: "I discussed with Hawkins the plaintiff's unwillingness to enter into a written contract with the defendant like the one [above described]. * * * He told me that if the plaintiff did not have to pay the tax, the defendant would get it back. * * * Then only did I make the contract of November 22, 1934." Hawkins testified that he talked with Orth concerning the processing taxes but denied any oral agreement to refund. He stated that: "I did not tell him that the plaintiff * * * would do the same with respect to refunds as the rest of the milling companies, nor did I agree to a refund of money to his company or imply such in any way."

About March 20, 1935, the defendant received the "Consolidated Flour Mills Co. News." An item in this weekly service rep-

now or hereafter imposed by any legislative or administrative branch of the United States shall inure to the benefit of the Buyer, if, as and when * * * realized and secured by the Seller, and shall be credited against the contract prices named in this contract to the extent— and only to the extent that the grain used in the manufacture of the product covered by this contract is milled after the decrease in the processing tax takes effect, and to the extent that the Seller is thereby definitely relieved from the processing tax. * * *" This contract also provided that if any tax increase or decrease was measured per bushel of grain, then the amount added or decreased was to be computed by use of the conversion factor.

resented that: "The miller passes the tax on to his consumer in toto. * * * The consumer pays the processing tax. His wheat flour cost $1.38 per barrel extra and his bread one-half cent per loaf extra. Collection at the rate of 30¢ per bushel of wheat ground is made from the millers monthly. * * *" Fred Burns of the plaintiff company testified that the first sentence of the News Sheet quoted above was incorrect but that it had never been retracted. He stated that the price of flour reflected the tax and that the quotation above was "a much simpler way to state it in the News Sheet." He added that: "The quantity of wheat required to make a barrel of flour varied * * * from four to five bushels. I have never figured the processing taxes in terms per barrel and nothing was added directly to the sales price of a barrel of flour because of this tax. We do not fix the price of flour we sell but the price is fixed as a result of bargaining at arm's length for wheat."

At the trial the defendant sought to introduce certain evidence which was excluded by the court. For instance the defendant offered to prove that many mills, which represented around ninety per cent of the volume of production in the milling industry, had made refunds to their customers for purchases made during the injunction period. In this connection Fred Burns of the plaintiff company testified that during the injunction period tax moneys in the amount of $520,363.70 had been impounded in court, and that when this was returned approximately $300,000 was refunded to certain of plaintiff's customers but the defendant was not one of the recipients.

The defendant also offered to prove that it was common knowledge among the milling industry that the amount of the tax included in the price for a barrel of flour was $1.38, that in general the price per barrel during the tax period was $1.38 higher than before the tax, and that the price per barrel was reduced between $1.10 and $1.38 immediately after the invalidation of the tax. In this connection Fred Burns testified that: "We did not raise the price per barrel of flour $1.38 after the day the tax went into effect. I do not know how much we raised it. It depended upon what the wheat market was. * * * The day after the tax was declared unconstitutional we did not reduce the price of flour $1.38 per barrel in order to get new orders at that time. We reduced it somewhat * * * but not $1.38 per barrel. On shipments that were under contract on January 6,

1936, we made a price adjustment of $1.-38 per barrel. * * * This was a voluntary reduction—we reduced it for competitive reasons only, and no other reasons."

Among other things defendant also offered to prove that its customers (the bakers) could not pass the tax on to the buying public because the weight of bread was regulated by statute and because there was no increase in the retail price during the tax period. Defendant further offered to prove that it would refund to the bakers any processing tax it might recover from the plaintiff and that some of defendant's customers are withholding from it an amount equal to the amount of the tax. In this connection it appears that the defendant transacted business with some bakers by written contract. There is one such contract in evidence and it contains a tax provision substantially similar to the tax clauses in issue here. It also appears that the defendant had orally agreed to many bakers who had no written contract, that it would refund the tax to the extent that the plaintiff made a refund.

In the counterclaim the defendant alleged that the plaintiff was prohibited from setting the tax item as a distinct item on the invoice because of a regulation of the Treasury Department which reads as follows: "If any person, in selling * * * any article or product processed from a commodity, misrepresents the amount of tax that has been paid thereon, he is guilty of a misdemeanor and is liable to a fine * * * or to imprisonment * * * or both." The defendant also alleges, and the evidence bears this out, that during the tax period the plaintiff sold the defendant some flour which it later resold to a charitable organization and that the plaintiff helped the defendant receive a refund of the tax involved in that transaction. Lastly defendant offered to prove that the plaintiff had not paid the 80 per cent Windfall Tax and that if plaintiff were to reimburse the defendant on the contracts in question for the amount of the tax, such payments could be deducted in the computation of plaintiff's Windfall Tax.

*Agreement to Refund or Reimburse.* The question in this case is the liability of the processor to his purchaser for Agricultural Adjustment Act tax refunds. Already this court has expressed itself on the question. Johnson v. Igleheart Bros., 7 Cir., 95 F.2d 4, certiorari denied, 304 U.S. 585, 58 S.Ct. 1058, 82 L.Ed. 1546; Cohen v. Swift & Co., 7 Cir., 95 F.2d 131. certiorari denied,

304 U.S. 561, 58 S.Ct. 943, 82 L.Ed. 1528; Continental Baking Co. v. Suckow Milling Co., 7 Cir., 101 F.2d 337. Moreover the Supreme Court of the state where the contract was made, has spoken. G. S. Johnson Co. v. N. Sauer Milling Co., 148 Kan. 861, 84 P.2d 934. The tax clauses contained in the four contracts here are substantially similar to the tax provisions interpreted and adjudicated in the cases cited above. Unless there is something more in this controversy it is imperative that we follow the cited cases.

■ The contracts in question expressly provide against the contingency of an increase or decrease in the processing tax. Counsel for the defendant contends that the language in question is broad enough to include protection against the contingency of a tax reduction due to tax invalidation. In other words he urges that the contracts constitute agreements to refund to or to reimburse the vendee in the event the tax is declared unconstitutional. This contention is logical and received the support of the dissenting opinion in the Igleheart case. However, this point was met squarely in the cited cases and we are inclined still to follow them. And we reach the same conclusion as to the contention that agreements to refund or reimburse impliedly arise from the express language of the contracts.

■ The defendant then points to the exchange of correspondence and to the long distance telephone conversation as evidencing an agreement to refund or reimburse or as modifying the written contracts. We have studied the correspondence and it is obvious that the plaintiff was not willing to enter into such an arrangement. Even Philip Orth, Jr., of the defendant company testified as to "plaintiff's unwillingness" in this respect. At the most there was here a conflict of testimony and we can not say that the trial court was wrong in believing the testimony which denied an oral agreement had been reached.

■ *Constructive Trust.* The defendant also seeks to sustain its position from the standpoint of equity although it admits that it had not borne the burden of the illegal tax. Much of the evidence adduced or offered by the defendant at the trial, is directed to this end. Yet we find nothing therein which calls for the constructive trust device or which gives basis for a right to restitution on the ground of quasi-contract. The contracts in question do not provide for a credit or refund to the buyer in the event the tax was annulled. Certainly the exchange of correspondence or long distance telephone conversation refute the existence of a fiduciary relation between the seller and the buyer. Nor is there evidence of fraud, coercion or mistake in this case: the tax was a charge on wheat (not on flour) and the plaintiff was the taxpayer; the contract price reflected this tax and the defendant paid the price voluntarily and with full knowledge of the facts. We are of the opinion that the defendant can not lay claim to a superior equity.

Moreover this is a case where only one price, the price paid for the flour, was stated. The contracts and invoices reveal that the defendant did not pay two separate funds to the plaintiff, namely, a fund for the flour and a fund for the tax. In this regard counsel for the defendant argues that a regulation of the Treasury Department had the effect of prohibiting the plaintiff from making a separate invoicing of the tax. To us this argument is more an admission that the price was a composite price, than anything else. There is evidence that the price reflected the tax but this is not evidence that the buyer paid a separate fund for the flour and a separate fund for the tax. "The amount added because of the tax is paid to get the goods and for nothing else." Lash's Products Co. v. United States, 278 U.S. 175, 176, 49 S. Ct. 100, 73 L.Ed. 251. "Perhaps the price is larger because of the tax but * * * no part of the price paid can be identified as money paid only for the tax." Continental Baking Co. v. Suckow Milling Co., 7 Cir., 101 F.2d 337, 339.

■ As we have shown and as the caselaw dictates, the rights of the parties are measured by the contracts. In construing these flour contracts—contracts where only one price (the price paid for the flour) was stated—the courts have not held that such contracts were agreements to refund any part of the purchase price in the event the processing tax was invalidated. It follows that evidence that the bakers bore the incidence of tax, that the defendant promised its customers the benefit of a refund by the plaintiff and that the defendant had contracts with its customers which were similar or dissimilar to the contracts in issue here, is of no avail.

■ *Contracts for Benefit of Bakers.* Counsel also takes the position that the contracts in question are contracts for the benefit of defendant's customers. To this end he directs our attention to the follow-

ing circumstances: at the time of the flour contracts the plaintiff knew that the defendant would resell the flour to bakers; the defendant admitted shifting the tax burden to the bakers; and the defendant offered to prove that the bakers bore the burden of the tax. We have considered counsel's argument, but our conclusion is that the contracts in question and the circumstances under which they were made, do not spell out contracts to discharge an obligation of the defendant or contracts for the benefit of defendant's customers.

The foundation of any right the defendant's vendees may have, whether they are donee beneficiaries or creditors of the defendant, is based on the contracts in question. There is nothing in these contracts which indicate that they were made with defendant's customers in mind or that third persons should have any rights thereunder. To accept defendant's construction of the contracts, is to do violence to the language therein. Nor will recourse to the surrounding circumstances justify our acceptance of the strained construction urged upon us by counsel for defendant. As we have already shown, the rights of the defendant are determined by the contracts in question. To evaluate the rights of defendant's customers, one must look to the contracts between the defendant and its vendees.

*Excessive Interest.* On August 25, 1936 the parties to this controversy entered into a written contract, upon which plaintiff bases its complaint. By this contract the plaintiff agreed to sell 2,505 barrels of flour at a purchase price of $13,462.40. The flour was shipped in nine installments, permissible under the contract, and arrival of each shipment at destination occurred in due time on various days between June 14, 1937, and July 1, 1937. A credit of $366.24 was allowed on the first shipment. On September 30, 1937, the plaintiff sent a statement of account to defendant, showing the purchase price unpaid. On October 23, 1937, the defendant paid $9,301.16, leaving a balance of $3,795. This action was instituted to compel payment of the balance.

Under the contract the terms of payment were stated to be "net cash draft with bill of lading attached." In this instance, however, the plaintiff permitted the defendant who had in past dealings "promptly paid upon arrival of the respective shipments," to take possession of the flour without prior payment. There is testimony by the defendant to the effect that the plaintiff "instead of shipping flour draft attached to bill of lading, shipped in on open account, accepting payment between 30 to 60 days after arrival."

The District Court computed interest on the shipments from their respective dates of arrival at destination to October 23, 1937 (the date of partial payment of the purchase price), and then allowed interest on the balance ($3,795) from October 23, 1937, to date of judgment. Counsel for defendant contends that the court should have computed interest from a period of time beginning 30 to 60 days after the respective dates of arrival at destination. Counsel argues that the contractual terms of payment were modified to that extent, and as evidence he points to the testimony above described and to the statement of account in which interest was not charged. The District Court was correct in its computation of the interest.

The contract does not provide that the defendant was entitled to make payment within 30 or 60 days (after arrival of the flour) without paying any interest. Plaintiff's action in permitting the defendant to take possession of the flour without prior payment, did not convert a contract requiring payment upon delivery into a contract permitting payment within 30 to 60 days after delivery. Only a written agreement between the parties could have had such effect. In this record there is no evidence of such an agreement. Certainly the testimony of defendant above described is not evidence of an agreement to vary the contractual terms of payment. Nor can such evidence be inferred from the past dealings of the parties.

Apparently counsel for the defendant places great weight on the statement of account which showed the unpaid purchase price and failed to include interest thereon. At the most this indicates that the plaintiff was at that time willing to accept the principal without interest if the amount were then paid. In this respect we endorse the expression of a state court which stated that "The fact that in subsequent statements interest was not charged was evidence that the plaintiff was then willing to waive its legal right to interest; but, in the absence of a settlement upon the statement, it would not deprive it of its right in this suit to recover interest according to the terms of the original contract." Lambeth Rope Co. v. Brigham, 170 Mass. 518, 49 N.E. 1022, 1023.

The judgment of the District Court is affirmed.