Jones, Judge,
delivered the opinion of the court:
The plaintiff, successor by merger to the rights of the Maryland Distillery, Incorporated, brings this action to recover payments amounting to $18,959.05 made to'the Secretary of Agriculture under a marketing agreement for The Distilled Spirits Industry entered into on December 9, 1933.
In 1933 Congress enacted the Agricultural Adjustment Act.
One of the features of the act provided for the establishment of voluntary marketing agreements to be signed by the Secretary of Agriculture and by those engaged in any particular line of industry.
One of those marketing agreements covered the “Distilled Spirits Industry.” The text of that agreement is attached to the petition as “Exhibit A.”
By the terms of the marketing agreement each contracting distiller, including plaintiff, agreed to pay for all cereal grains or products thereof used by him in the manufacture of distilled spirits, a total amount per unit not less than the fair exchange value thereof. The fair exchange value is defined in the Agricultural Adjustment Act, approved May *519 12, 1933 (48 Stat. 31, 36), as such price as will give agricultural commodities a purchasing power with respect to ■articles that farmers buy equivalent to the average purchasing power of agricultural commodities in the base period, the base period for cereal grains being August 1909 to July 1914.
It further stipulates that if the price paid by the contracting distillers, plus processing or other tax levied under the act, is less than the fair exchange value of such grain or product, the distiller “shall pay the amount of such difference (hereinafter known as the parity payment) into the 'Treasury of the United States or such other depository as may be designated by regulations of the Secretary” (article IV, section 3, Marketing Agreement). It was under this provision that the fund in question came into being.
Plaintiff alleges that the funds were deposited in a special account in the Treasury of the United States designated as “8055, Collections, Distilled Spirits Industry, Parity Payments, Trust Fund” and that such funds are now being held in the special account in the Treasury of the United States ■and designated “Proceeds Distilled Spirits Industry, Parity Payments.”
It is further alleged that the payments so made cannot now be used for the purpose specified in the marketing agreement because:
(a) The United States had no legal authority to provide for payments and disbursements in the manner provided in the act.
(b) Such payments were to be used for the purposes ■specified in the Marketing Agreement within a reasonable time and not thereafter, and that such reasonable time has ■elapsed.
The plaintiff contends
One: That the parity payment fund is held in a resulting trust, of which plaintiff is the beneficiary.
Two: That the obligation of the Government to return the parity payment to plaintiff is a contract implied in fact, •over which the court has jurisdiction.
Three: That the court has jurisdiction of the case because the claim is one founded upon a law of Congress.
*520 Defendant; demurred to tbe plaintiff’s petition on the ground that
One: The court is without necessary jurisdiction to hear and determine the claim alleged in the petition.
Two: The petition does not state facts sufficient in law to constitute a cause of action.
Three: The identical cause of action is now being tried in other Federal courts against officers of the United States. It cites the case of Stitzel Weller Distillery v. Wallace, et al., 30 F. Sup. 1010 (Dist. Ct.) claiming that (1) the complaint in that case shows that it is based on the same factual situation; (2) that the action is a representative one in behalf' of the various distillers who were parties to the marketing-agreement; (3) that the cause of action was dismissed on the ground that the United States is an essential party to. the proceedings, and that such case is now pending on appeal in the United States Court of Appeals for the District of Columbia.
Section 4 of the Marketing Agreement is as follows:
Payments under this section shall be made at such times and in such manner, and shall be computed in accordance with such requirements as may be prescribed by regulations of the Secretary. Such amounts shall be utilized for rental or benefit payments or other disbursements under the Act made with respect to grain.
By the terms of the Marketing Agreement the Secretary of Agriculture was authorized to issue special permits to contracting distillers to manufacture alcohol from commodities other than' cereal grain or products thereof in an amount not less than 10% of the amount of ethyl alcohol required for the manufacture of gin or the rectification of distilled spirits during the period of the operation of such permit.
The distiller agreed, through the agency of' the Code Authority established pursuant to the Code of Fair Competition for the Distilled Spirits Industry, to cooperate with the Administration and the Secretary in carrying out the agreement and it was made the duty of the Code Authority to act as an agency “through which the contracting distillers might make recommendations to effectuate the declared policy of the Act.”
*521 All parties to the marketing agreement were given exemptions from prosecution under the anti-trust laws.
The alleged grounds of recovery are so interwoven and. overlapping that they will be treated together.
We cannot see how under the allegations of the plaintiff’s-petition, when read alongside the marketing agreement and the terms of the Code Authority under which the plaintiff and its co-signers were operating, it can have any possible interest in the funds that were thus by voluntary agreement paid' into the hands of the administrative authorities. The payments were unconditional. It* was not necessary that any special fund be established; and far greater sums have been paid out to the same purposes for which these collections were made.
According to the provisions of Section 4 of the Marketing Agreement, it was made the duty of the Secretary of Agriculture to utilize the amounts collected “for rental or benefit payments or other disbursements under the Aet made with respect to grain” [italics ours].
There is nothing in the agreements or in the code under which the distillers were operating that required the Secretary to establish a special fund, trust or otherwise. In fact, it is doubtful whether the Secretary - had any authority under the Agricultural Adjustment Act to establish á trust fund. • ■
The provision in the agreement that such amounts should be utilized for rental or benefit payments or other disbursements under the act with respect to grain gave to the farmers — if to anyone — an interest in the amount of this fund, .and placed upon the Secretary a direct obligation to pay such amount to them.
There were several purposes set out in the Agricultural-Adjustment Act for which available funds could be used. In addition to making payments for the reduction of acreage, they could be used to make payments to induce the reduction of production for ■ market, or for payments to farmers on that part of their production which was needed •for the domestic market without regard to total acreage or production. Such funds could also be used for administrative expenses.
*522 Under Section 12 of the Agricultural Adjustment Act $100,000,000.00 advance appropriation was made available to the Secretary of Agriculture for administrative expenses and for benefit payments. The use of this fund was not limited to contracts for a reduction in acreage which later came under the ban of the Supreme Court, but under the terms of the act it might also be used for reduction in the production for market. In addition, the Secretary of Agriculture and the Secretary of the Treasury were authorized to estimate from time to time the amounts in addition to such sum of $100,000,000.00 which might be currently required for such purposes, and the Secretary of the Treasury was authorized, out of any money in the Treasury not otherwise obligated, to advance to the Secretary of Agriculture the amount so estimated.
Under Part II of the Agricultural Adjustment Act the Secretary of Agriculture was authorized to provide for rental or benefit payments in connection with that part of the production of any basic agricultural commodity required for the domestic consumption in such amounts as the Secretary might deem fair and reasonable. This had no connection whatever with contracts for acreage control.
In addition, the act authorizes many other things to be done, for all of which purposes the language of the act. became authority for the making of appropriations.
Pursuant to the purposes named in the act, the Congress from time to time appropriated hundreds of millions of dollars that were used in connection with grain during the years 1933, 1934, and 1935. After the decision in the Butler case in January 1936 (297 U. S. 1), in which the Supreme Court held invalid the processing taxes on the ground that they were earmarked for an illegal purpose, the Congress, on February 11, 1936' (49 Stat. 1109, 1116) appropriated an additional $296,185,000.00 to be paid to farmers for their 1935 operations under the act. Out of this appropriation the sum of $85,000,000.00 was used for making payments in connection with grain.
During 1933 and succeeding years many millions of dollars were used for administrative purposes in connection *523 with grain. These facts are all established by public documents and records.
Plaintiff claims that, regardless of the amount that may have been spent in this manner, this particular fund was not expended. The language of Section 4, however, does not say that the very dollars that are collected shall be paid out, but that such amount shall be utilized.
The establishment of this special fund was a bookkeeping transaction indicating that that particular amount of money rather than the particular dollars was to be used for a special purpose. When the same people, the same officials of the Government who had charge of the entire transaction, spent not only that amount but many times that amount for the purposes for which such money was paid into the Treasury all the purposes for which collection had been made were achieved, and all the duties which were imposed upon those officials were discharged. In these circumstances it is difficult to see how any theory of unjust enrichment can be maintained.
Plaintiff undertakes to justify the alleged trust in behalf of itself on the ground that it got nothing out of the transaction — nothing out of the marketing agreement — and that it entered into the agreement purely because it wanted to be helpful and to contribute to the welfare of the farmers who were in desperate circumstances by virtue of economic conditions then prevailing. In other words, it claimed that in so far as those transactions are concerned it had become a purely philanthropic institution. Such a position is almost enough to stagger credulity.
We are constrained to believe that the plaintiff did get or expected to get substantial benefits from the transaction. Under Article VIII of the marketing agreement special permits were issued to signatory distilleries which granted them the privilege of manufacturing, from commodities other than cereal grain, not less than 10% of the ethyl alcohol needed to meet the requirements of the country during the period of operation under the marketing agreement. Distillers who did not sign the marketing agreement were subject to a general license provision which required *524 them to manufacture distilled spirits exclusively from cereal grains.
Article-III, section 1 of the license, applicable to all'distillers, provided: • "
Except as provided by special permit issued pursuant to Article V of the Marketing Agreement for the Distilled Spirits Industry, each distiller shall manufacture distilled spirits (including any mash, wort, or. wash used therefor), after the effective date of this License, exclusively from cereal grains or their products; and market for beverage use only such distilled spirits now held or hereafter acquired by him as are manufactured from cereal grains or their products.
The special permit to manufacture such spirits from other commodities than cereal grain was subject to the express condition that the permitee pay into the Treasury of the United States under Article IY of the marketing agreement
* * * an amount, per unit of the commodity used under permit, equal to the parity payment, if any, then in effect per equivalent unit of the cereal grain or product thereof, if any, normally used, or available for use by the permitee. In addition, if no processing or other tax under the Act is in effect with respect to the commodity used under permit, the amount to be so paid shall be increased by the amount of the processing or other tax under the Act, if any, then in effect per equivalent unit of such cereal grain or product thereof (art. Y. sec. 2).
The parity payments on molasses were to be based on conversion factors in terms of corn unless the distillers should establish to the satisfaction of the Secretary that corn was not normally used or available for use by the distillers (Alcoholic Beverage Regulations, Series 1, issued by the Department of Agriculture and printed by the United States Government Printing Office).
Thus, the license for which the distillers applied under the terms of the marketing agreement gave the grain distillers the greater share of the market for beverage alcohol to be used in blended whiskey, gin cordials, and liqueurs, by limiting the amount of beverage alcohol which could be manufactured from molasses. This feature protected the *525 contracting distillers from competition from industrial alcohol manufacturers in the manufacturing and marketing of the great volume of beverage alcohol used directly after repeal. The distillers were further protected against the small amount of competing molasses beverage alcohol which might be marketed by the requirement that the processing tax and parity payment on corn be paid per equivalent unit of molasses.
In the light of these requirements and to secure these privileges plaintiff voluntarily signed the marketing agreement. Section 8, paragraph 3 of the Agricultural Adjustment Act stipulated that any person engaged in handling in the current of interstate commerce any agricultural commodity or product thereof without a license as required by the Secretary under this section should be subject to a fine of not more than $1,000.00 for each day during which the violation occurred. The marketing agreement sections of the Agricultural Adjustment Act have never been invalidated. On the contrary, Section 4 of Public No. 137, 75th Congress, approved June 3, 1937 (50 Stat. 246), which reenacted with amendments certain provisions of the Agricultural Adjustment Act of 1933, as amended, relating to the marketing program, provided:
Nothing in this Act shall be construed as invalidating any marketing agreement, license, or order, or any regulation relating to, or any provision of, or any act of the Secretary of Agriculture in connection with, any such agreement, license, or order which has been executed, issued, approved, or done under the Agricultural Adjustment Act, or any amendment thereof, but such marketing agreements, licenses, orders, regulations, provisions., and acts are hereby expressly ratified, legalized, and confirmed. [Italics supplied.]
Paragraph 2 of Section 8 of the Agricultural Adjustment Act provided that the parties to any marketing agreement should be eligible for loans from the Reconstruction Finance Corporation. While the amount of these loans was limited to the amounts that might be authorized by the agreement, Section 4 of the marketing agreement in the instant case gave the distillers the right to make recommendations for *526 the purpose of effectuating the declared policy of the act. Under this provision they could have had the privilege of securing loans for this purpose, if they had desired to make such a recommendation.
Plaintiff’s claim that there is an implied contract has no basis in fact, since the marketing agreement, which is in writing, and which the plaintiff signed, is an express one. It is well settled that no cause of action can arise upon an implied contract where the parties have made an express contract, dealing with the same subject matter, so long as the special agreement remains in force. Hawkins v. United States, 96 U. S. 689.
The claim that plaintiff is entitled to recover in this court under an Act of Congress is based on section 19 of the Permanent Appropriation Repeal Act (48 Stat. 1232). This section refers only to funds of the Interior and Labor Departments. Manifestly it can have no application to the instant case.
We hold that the petition, the exhibits, the records and public documents and records referred to therein and necessarily connected therewith disclose the following:
One. Neither the terms of the act nor the provisions of the marketing agreement required the establishment of a trust fund for the benefit of plaintiff and associated distilleries.
Two. The method of depositing and the manner of distribution of the funds collected, or equivalent sums, were a matter of choice by the Secretary of Agriculture within the limits set out in the marketing agreement and the act under which it was formulated. In the absence of distribution by the Secretary of Agriculture, it is within the competency of Congress to direct its distribution subject possibly to the same limitations.
Three. All the purposes of the collection of the special sums have been fully accomplished by the expenditure of much larger amounts from time to time for the identical, objectives named in the marketing agreement.
Four. 'Plaintiff’s allegations when read in connection with the marketing agreement and the Alcoholic Beverage Regu *527 lation, which are referred to in the petition, fail to disclose any interest on the part of plaintiff in the alleged fund.
It follows that the demurrer must be sustained and the petition dismissed. It is so ordered.
Madden, Judge; WhitakeR, Judge; Littleton, Judge; and Whaley, Chief Justice, concur.