# Lobbying by Executive Branch Personnel

Title 18, section 1913 of the U.S. Code does not bar conversations which a Peace Corps employee had with certain members of Congress at the direction of the Director of the Peace Corps in an attempt to enlist their support for a bill to establish the Peace Corps on a statutory basis.

A literal interpretation of 18 U.S.C. § 1913, which would prevent the President or his subordinates from formally or informally presenting his or his administration's views to the Congress, its members, or its committees regarding the need for new legislation or the wisdom of existing legislation, or which would prevent the administration from assisting in the drafting of legislation, would raise serious doubts as to the constitutionality of that statute. As so interpreted, it would seriously inhibit the exercise of what is now regarded as a basic constitutional function of the President concerning the legislative process.

October 10, 1961

MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION

This is in response to your request for my comment regarding Congressman H.R. Gross's letter of August 24, 1961 to the Attorney General. Mr. Gross called the Attorney General's attention to testimony given on August 4, 1961 by Sargent Shriver, Director of the Peace Corps, before the Subcommittee on Manpower Utilization of the House Post Office and Civil Service Committee, to the effect that Bill Moyers, a paid employee of the Peace Corps, had joined him in conferring with various congressmen to enlist their support of a bill to establish that organization on a statutory basis. Mr. Gross is of the view that this action by Messrs. Shriver and Moyers conflicted with section 209 of the General Government Matters Appropriation Act, 1961,[1] and he requests a "review and disposition" of the matter.

## I.

The statute referred to by Mr. Gross reads as follows:

> No part of any appropriation contained in this or any other Act, or of the funds available for expenditure by an individual, corporation, or agency included in this or any other Act, shall be used for publicity or propaganda purposes designed to support or defeat legislation pending before Congress.

---

[1] Pub. L. No. 86-642, 74 Stat. 473, 478.

*Id.* § 209. A similar or identical provision has been enacted in one or more appropriation acts each year since 1951,[2] when it appeared in section 408 of the Department of Agriculture Appropriation Act, 1952[3] and shortly thereafter in section 603 of the Independent Offices Appropriation Act, 1952.[4]

The provision made its way into the Department of Agriculture Appropriation Act, 1952, by means of a floor amendment in the House.[5] The sponsor of the amendment, Congressman Smith of Wisconsin, was critical of the number of public relations personnel employed in the government agencies and of the great volume of government publications. He recommended his amendment and it was adopted in the context of stemming the flow of such publications.[6] Although there was no discussion of this amendment in the Senate Committee report and no mention of it in debate on the Senate floor, Senate discussion of the same amendment in the Independent Offices Appropriation Act disclosed a concern only with the expenditure of government funds for personal services and publications intended to affect the course of legislation by molding public opinion.[7] The enactment of this provision in the years since 1951 has been routine and without significant congressional comment.

It will be seen that the legislative history of the language in section 209 of the General Government Matters Appropriation Act of 1961 does not support the application of that section, or of the identical legislation currently in effect,[8] to purely private meetings by Executive Branch officials with members of Congress. Furthermore, the "publicity or propaganda purposes" which are the sine qua non of the expenditures made unlawful by section 209 cannot reasonably be found to inhere in such private meetings. I am of the opinion, therefore, that Mr. Shriver and Mr. Moyers did not violate the statutory provision referred to by Mr. Gross when they visited Members of Congress in support of the Peace Corps legislation.

Although Mr. Gross did not mention 18 U.S.C § 1913, that statute has some relevance in connection with his complaint. In the absence of an express congressional authorization to the contrary, it prohibits the use of appropriated funds

> to pay for any personal service, advertisement, telegram, telephone, letter, printed or written matter, or other device, intended or designed

---

[2] The provision was most recently enacted as section 509 of the General Government Matters, Department of Commerce, and Related Agencies Appropriation Act, 1962, Pub. L. No. 87-125, 75 Stat. 268, 283 (Aug. 3, 1961).

[3] Pub. L. No. 82-135, 65 Stat. 225, 247 (1951).

[4] Pub. L. No. 82-137, 65 Stat. 268, 291 (1951).

[5] 97 Cong. Rec. 5474–75 (May 17, 1951).

[6] *Id.*

[7] 97 Cong. Rec. 6733–39 (June 19, 1951); 97 Cong. Rec. 10,065 (Aug. 15, 1951); 97 Cong. Rec. 10,111 (Aug. 16, 1951).

[8] *See supra* note 2.

to influence in any manner a Member of Congress, to favor or oppose, by vote or otherwise, any legislation or appropriation by Congress, . . . but this shall not prevent officers or employees of the United States or of its departments or agencies from communicating to Members of Congress on the request of any Member or to Congress, through the proper official channels, requests for legislation or appropriations which they deem necessary for the efficient conduct of the public business.[9]

Section 1913 is derived from section 6 of the Third Deficiency Appropriation Act, Fiscal Year 1919.[10] While the committee reports make no mention of this section, the floor manager of the bill in the House explained that

It is new legislation, but it will prohibit a practice that has been indulged in so often, without regard to what administration is in power—the practice of a bureau chief or the head of a department writing letters throughout the country, sending telegrams throughout the country, for this organization, for this man, for that company to write his Congressman, to wire his Congressman, in behalf of this or that legislation. . . . The gentleman from Kentucky, Mr. Sherley, former chairman of this committee, during the closing days of the last Congress was greatly worried because he had on his desk thousands upon thousands of telegrams that had been started right here in Washington by some official wiring out for people to wire Congressman Sherley for this appropriation and for that. Now, they use the contingent fund for that purpose, and I have no doubt that the telegrams sent for that purpose cost the Government more than $7,500. Now, it was never the intention of Congress to appropriate money for this purpose, and section [6] of the bill will absolutely put a stop to that sort of thing.[11]

It is apparent that 18 U.S.C. § 1913 was enacted for essentially the same purpose as the recent appropriation act provisions considered above. However, applied literally, 18 U.S.C. § 1913 would seem to preclude Executive Branch officials from speaking or otherwise communicating in support of proposed legislation to members of Congress, as distinguished from Congress as a body, except upon the request of a member. Moreover, applied literally, the section would seem to preclude any communications whatsoever, whether invited or not,

---

[9] A search has revealed no judicial or formal administrative precedents concerned with 18 U.S.C. § 1913.

[10] Pub. L. No. 66-5, 41 Stat. 35, 68.

[11] 58 Cong. Rec. 403 (May 29, 1919).

from representatives of the Executive Branch to Congress or members of Congress for the purpose of expressing opposition to proposed legislation. These extreme prohibitions have not been observed by either the Legislative or the Executive Branch and, as a practical matter, could not be observed without great harm to the lawmaking process. Accordingly, I agree with the conclusion reached by now Senator Thomas J. Dodd in his memorandum of June 7, 1940 to Mr. Rogge (a copy of which you forwarded) that this statute is to be construed in the light of its purpose in order to avoid any absurd results flowing from its literal application. Viewing the statute in this light in relation to the instant matter, I am of the opinion that it did not bar the conversations which Mr. Moyers had with certain members of Congress at the direction of Mr. Shriver even though the conversation took place at the instance of Mr. Shriver and not at the request of the congressmen.

## II.

Passing to the inquiry of the Deputy Attorney General as to "how Justice personnel can be used on the hill," I might observe at the outset that the so-called "federal lobby" has more than once been the subject of criticism by members of Congress and others.[12] However, the criticism has almost always arisen from activities by government officials which are considered to be aimed at rallying opinion for or against pending legislation and not from the occurrence of personal conferences between such officials and members of Congress or their aides.[13]

In 1949 the House constituted a Select Committee on Lobbying Activities to investigate, among other things, "all activities of agencies of the Federal Government intended to influence, encourage, promote or retard legislation."[14] In the course of remarks made at the beginning of hearings on this phase of the Committee's assignment, the Chairman stated:

> As I said in opening our previous sessions in this series of hearings, it is necessary in a democracy, for our citizens, individually or collectively, to seek to influence legislation. It is equally necessary for the executive branch of Government to be able to make its views known to Congress on all matters in which it has responsibilities, duties, and opinions. The executive agencies have a definite requirement to express views to Congress, to make suggestions, to request

---

[12] See Dorothy C. Tompkins, *Congressional Investigation of Lobbying: A Selected Bibliography* 16–23 (1956), for a list of writings on the legislative activities of the federal agencies.

[13] For example, the Subcommittee on Publicity and Propaganda of the House Committee on Expenditures conducted an investigation in 1947–48 to inquire into "reports of the persistent efforts within the administrative agencies of Government to discredit Congress and to influence legislation." H.R. Rep. No. 80-2474, at 1 (1948).

[14] H.R. Res. 298, 81st Cong. (enacted).

needed legislation, to draft proposed bills or amendments, and so on. . . .

What I am trying to make abundantly clear here at the start is that the executive agencies have the right and responsibility to seek to "influence, encourage, promote or retard legislation" in many clear and proper—and often extremely effective—respects, and that definite machinery is provided by law and by established custom for the exercise of these rights, but that, under certain conditions, Federal funds cannot be spent to influence Congress.[15]

The concern of the Committee members during this portion of the hearings was almost exclusively with conduct of agency heads and lesser officials which generated public pressure on members of Congress. Only two or three brief exchanges in the hearings dealt with personal efforts on the part of government officials to persuade congressmen to vote for or against legislation.[16]

In an interim report[17] the Select Committee pointed out that Article II, Section 3 of the Constitution, relating to the duties and powers of the President, provides that "he shall from time to time give to the Congress Information on the State of the Union and recommend to their Consideration such Measures as he shall judge necessary and expedient." The Committee went on to comment that

in furtherance of basic responsibilities the executive branch, and particularly the Chief Executive and his official family of departmental and agency heads, inform and consult with the Congress on legislative considerations, draft bills and urge in messages, speeches, reports, committee testimony and by direct contact the passage or defeat of various measures.[18]

---

[15] *Legislative Activities of Executive Agencies: Hearings Before the H. Select Comm. on Lobbying Activities*, 81st Cong., pt. 10, at 2 (1950).

[16] For example, Congressman Halleck at one point asked the Administrator of the Housing and Home Finance Agency whether he or any subordinate "unsolicited, undertook to persuade Members of Congress in respect to the legislation." After receiving a negative response, Mr. Halleck observed that it seemed to him many times that "the executive departments have pressed with undue vigor on matters of legislation almost to the point of usurpation of the legislative authority." *Id*. at 51. At another point the Federal Security Administrator averred that "there is no law that says I cannot try to influence Congress on my own" as an officer, if not using federal funds for that purpose. *Id*. at 341.

[17] H.R. Rep. No. 81-3138, at 51 (1950).

[18] *Id*. at 52; *see also id.* at 54.

In its final report the Select Committee made no criticism of any particular lobbying practices by government officials and concluded that 18 U.S.C. § 1913 is adequate to prevent improper lobbying activities by these officials.[19]

The Select Committee was sound in emphasizing that the participation of the President in the legislative function is based on the Constitution. "[I]t was the intention of the Fathers of the Republic that the President should be an active power [in legislation] . . . . [H]e is made by the Constitution an important part of the legislative mechanism of our government."[20] "The President's right, even duty, to propose detailed legislation to Congress touching every problem of American society, and then to speed its passage down the legislative transmission belt, is now an accepted usage of our constitutional system."[21] This constitutionally established role in the legislative process has become so vital through the years that the President has been aptly termed the Chief Legislator.[22]

The Select Committee was also sound in recognizing that the President cannot carry out his constitutional duties in the legislative arena by himself and that necessarily he must entrust authority to his chief subordinates to act, and in turn to direct their own subordinates to act, in this arena in his stead.[23] The Hoover Commission's Task Force on Departmental Management made a similar point in stating that a department head is at all times an assistant to the Chief Executive but that

> as a part of the executive branch, he has also the constitutional obli-
> gation both to consult with and inform the legislature, as well as to
> see that legislative intentions expressed through statutes are real-
> ized.[24]

Congress itself has given specific recognition to the propriety of "lobbying" activities on the part of government officials in section 308 of the Federal Regulation of Lobbying Act of 1946.[25] That section in general imposes registration requirements on persons who are paid for attempting to influence passage or

---

[19] H.R. Rep. No. 81-3239, pt. 1, at 35–36 (1951). The minority party members of the Committee, although not advocating any legislation in addition to 18 U.S.C. § 1913, criticized the Committee as having "seen fit to defend lobbying by Government." *Id.* pt. 2, at 4.

[20] Thomas J. Norton, *The Constitution of the United States: Its Sources and Its Application* 123 (special ed. 1940, 8th printing 1943).

[21] Clinton Rossiter, *The American Presidency* 108 (2d rev. ed. 1960).

[22] Lawrence H. Chamberlain, *The President, Congress and Legislation* 14 (1946); Rossiter, *supra* note 21, at 38; *see also* Edward S. Corwin, *The President: Office and Powers* 265–77 (4th ed. 1957).

[23] Examples of significant legislative activities by executive agency personnel of varying ranks during the period beginning about 1890 appear in Chamberlain, *supra* note 22.

[24] 3 U.S. Comm'n on Org. of the Exec. Branch of the Gov't, Report of the Task Force on Departmental Mgmt. in Fed. Admin., *Departmental Management in Federal Administration* 40 app. E (1949).

[25] Pub. L. No. 79-601, 60 Stat. 812, 839, 841 (codified at 2 U.S.C. § 267).

defeat of any legislation by Congress. However, certain categories of persons are excepted from these requirements, including in particular a "public official acting in his official capacity." *Id.*

It must be conceded that the constitutional activities of the President, and of subordinate officers of the Executive Branch acting on his behalf to influence legislation, can, like other areas of his constitutional authority, be subjected to a measure of control by limitations imposed by Congress upon the use of appropriated funds. Congress

> may grant or withhold appropriations as it chooses, and when making an appropriation may direct the purposes to which the appropriation shall be devoted. It may also impose conditions with respect to the use of the appropriation, *provided always that the conditions do not require operation of the Government in a way forbidden by the Constitution.*

*Authority of Congressional Committees to Disapprove Action of Executive Branch*, 41 Op. Att'y Gen. 230, 233 (1955) (emphasis supplied); *see also United States* v. *Butler*, 297 U.S. 1, 73–74 (1936). I would therefore consider it most doubtful whether Congress could impose limitations upon the use of appropriated funds which go so far as to render it altogether impractical or impossible for the President, and those acting pursuant to his direction, to carry out a basic constitutional function.

I would not be prepared to take the position that the limitation contained in the General Government Matters Appropriation Acts on the use of appropriated funds for publicity or propaganda campaigns does go so far. I believe, however, that a literal interpretation of 18 U.S.C. § 1913 which would prevent the President or his subordinates from formally or informally presenting his or his administration's views to the Congress, its members or its committees as to the need for new legislation or the wisdom of existing legislation, or which would prevent the administration from assisting in the drafting of legislation, would raise serious doubts as to the constitutionality of that statute. As so interpreted, it would seriously inhibit the exercise of what is now regarded as a basic constitutional function of the President concerning the legislative process. It seems clear that this consideration significantly affected the view of 18 U.S.C. § 1913 taken by the House Select Committee on Lobbying. As understood by that committee, 18 U.S.C. § 1913 prohibits only substantially the same activities as are covered by the limitation in the appropriation acts. In addition, it should be noted that the consistent practice in the over forty years during which 18 U.S.C. § 1913 has been in effect is based upon the assumption that it goes no further.

## III.

Having in mind the constitutional provision and other material referred to above, I make the following observations in response to the Deputy Attorney General's inquiry as to the use of department personnel at the Capitol:

1. There is no legal objection to the use of any officer or employee of the Department to call upon members or aides of the Congress to express the position of the Department with regard to proposed legislation in which it has a proper interest.

2. There is no legal objection to the Department's rendering drafting assistance to a member of Congress or a congressional committee which requests it—or volunteering such assistance when the Department deems it appropriate.

3. There is no legal objection to the Department's placing members of its staff at the disposal of a congressional committee which is meeting in executive session either to study or to mark up a bill.[26]

4. There is no legal objection to the Department's requesting permission for a representative to testify at public hearings of a congressional committee. Whether a request will be granted is, of course, within the discretion of the committee and it is therefore desirable, if possible, to ascertain in advance of the request what the reaction is likely to be.

5. Representatives whom the Department sends to the Capitol should leave no doubt that they are acting solely in an official capacity and they should make certain that any department views and positions they may present are identified as such rather than as their own personal views.

NICHOLAS deB. KATZENBACH
*Assistant Attorney General*
*Office of Legal Counsel*

---

[26] It is interesting to note that an executive branch employee, Benjamin V. Cohen, was present on the floor of the House of Representatives during a session in 1934 at the request of Speaker Rayburn, then Chairman of the Committee on Interstate and Foreign Commerce, to aid him in explaining the bill that became the Securities Exchange Act of 1934. 78 Cong. Rec. 7943–44 (May 2, 1934).